Lui KIN–HONG, a/k/a Jerry
Lui, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. CA 96–10849–JLT.

United States District Court,
D. Massachusetts.

April 25, 1996.

Harvey A. Silverglate, Andrew Good, Silverglate & Good, Boston, MA, for Lui Kin-Hong aka Jerry Lui.

Alex Whiting, Susan C. Hanson–Philbrick, United States Attorney's Office, Boston, MA, for U.S.

## MEMORANDUM

TAURO, Chief Judge.

### I.

### INTRODUCTION

The Crown Colony of Hong Kong seeks Petitioner Jerry Lui's extradition to have him stand trial on charges of bribery. At the request of the United Kingdom, acting on behalf of Hong Kong, the Government of the United States apprehended Lui in Boston, Massachusetts on December 20, 1995. He has been detained in the Plymouth County Correctional Center since December 20, 1995. At issue here, is Lui's challenge to Magistrate Judge Zachary Karol's decision denying him bail.

### II.

### BACKGROUND

#### A. Political and Legal Background

This case is set against the backdrop of significant political and legal changes occurring in Hong Kong. Extradition to Hong Kong is presently governed by the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland (the "Treaty").[1]

---

1. June 8, 1972, U.S.–U.K., 28 U.S.T. 227, made applicable to Hong Kong by an exchange of notes in Washington, D.C., on October 21, 1976. The Treaty was modified by the Supplementary Treaty Concerning the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, ratified and entered into force on December 23, 1986, S. Treaty Doc. No. 99–8, 99th Cong., 1st

In 1898, the United Kingdom leased the New Territories of Hong Kong from China for a period of ninety-nine years. Convention of Beijing, June 9, 1898, in 1 *Treaties and Agreements with and Concerning China,* 1894–1919, 130, No. 1898/11 (1921). The remaining parts of Hong Kong were also ceded to the United Kingdom. *See* Comment, *The Reversion of Hong Kong to China: Legal and Practical Questions,* 21 Willamette L.Rev. 327 (1985). On July 1, 1997, all of Hong Kong will revert to the People's Republic of China ("the PRC"), pursuant to the Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong with Annexes, Beijing, December 19, 1984, ratified and entered into force May 27, 1985, T.S. No. 26 (1985), Cmnd. 9543.

Hong Kong's extradition relationships with other states has rested exclusively with the United Kingdom. *See* Janice Brabyn, *Hong Kong Transfer of Sovereignty: Extradition and the Hong Kong Special Administrative Region,* 20 Case W. Res. J. Int'l L. 169, 173 (1988). Hong Kong's present extradition powers are dependant on its colonial status with the United Kingdom. *Id.* When reversion occurs, Hong Kong will cease to have the authority to request extradition based on the extradition treaty between the United States and the United Kingdom. *Id.*

At present, there is no extradition treaty between the PRC and the United States. *See* 18 U.S.C.A. § 3181 (West 1996) (listing countries with whom the United States has an extradition treaty). Consequently, any person held pursuant to an extradition request from Hong Kong in the United States after the date of reversion will have to be released. Although the Government does not contest that eventuality, it does proffer the possibility of an extradition treaty between the United States and the PRC being finalized within the next fourteen months. Based on the information in the record and in the public domain, this court concludes that it is highly improbable that such a treaty will be signed by the United States and the PRC, and then ratified by two-thirds of the Senate, within the next fourteen months.

### B. Procedural Background

On December 19, 1995, the United States Attorney filed a complaint, pursuant to 18 U.S.C.A. § 3184 (West 1996),[2] in the United States District Court for the District of Massachusetts against Lui, seeking a warrant for his arrest for the purpose of extraditing him to the Crown Colony of Hong Kong. The complaint stated that Hong Kong had issued a warrant for the arrest of Lui for allegedly violating Section 9(1)(a) of Hong Kong's Prevention of Bribery Ordinance. It further stated that the Government of the United Kingdom, after learning that Lui planned to arrive at Logan Airport in Boston, Massa-

Sess., 132 Cong. Rec. 16557 (1986). All of the above treaties are reprinted in 2 *Extradition Laws and Treaties, United States* 920.1–920.30 (compiled by Igor I. Kavass & Adolf Sprudzs, 1980 & Rev. 6, 1989).

**2.** 18 U.S.C.A. § 3184 provides:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he

may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

The statute goes back to the Act of August 12, 1848, 9 Stat. 302. It was continued as Rev.Stat. § 5270, appears as 18 U.S.C. § 651 (1940 ed.), and was codified in substantially its present form in 1948, 62 Stat. 822.

chusetts on December 20, 1995, requested that the United States arrest Lui for the purpose of extraditing him to Hong Kong. Magistrate Judge Karol issued the warrant, and members of the Federal Bureau of Investigation arrested Lui at Logan Airport on December 20, 1995.

On December 21, 1995, Lui appeared before Magistrate Judge Karol. The Government requested that Lui be detained pending the completion of the extradition proceedings. Magistrate Judge Karol ordered Lui temporarily detained, pending a full hearing on the Government's motion. On January 4, 1996, Lui filed a cross-motion to be released on conditions. On January 10, 1996, Magistrate Judge Karol heard arguments on the motions.[3] The parties were granted leave to file additional papers on or before January 17, 1996.[4]

In an order issued on February 2, 1996, Magistrate Judge Karol allowed the Government's motion for detention and denied Lui's request to be released on conditions. In his memorandum in support of the order, the Magistrate Judge found that Lui posed a high risk of flight and that there existed no set of conditions of release that would assure his presence at future proceedings. The Magistrate Judge also found that there were no "special circumstances" warranting Lui's release on bail.

On February 12, 1996, Lui filed a notice of appeal and a motion for reconsideration. On February 26, 1996, Magistrate Judge Karol denied Lui's motion for reconsideration. This court held hearings on Lui's appeal on April 3, 1996 and on April 22, 1996.

## C. Factual Predicate Alleged for Lui's Arrest

Hong Kong authorities allege that in 1991 Lui was promoted to the position of Commercial Director of the British American Tobacco Co. (HK) Ltd. ("BAT"), in Hong Kong. (Aff. Godfrey ¶ 8). BAT had exclusive rights to distribute cigarettes in several Asian countries. (Aff. Godfrey ¶ 6). As Commercial Director, Lui had the responsibility of allocating a share of the cigarettes to selected Hong Kong trading companies. (Aff. Godfrey ¶ 7). Lui, along with other BAT executives, allegedly solicited and accepted bribes in excess of several million dollars from Giant

---

**3.** The evidence submitted at the hearing by the Government was as follows: (1) Government's Exhibit 1: United States Department of Justice Federal Bureau of Investigation Inventory List dated December 20, 1995; (2) Government's Exhibit 2: Levan Travel & Tours International, Inc. Travel Itinerary, dated December 18, 1995; (3) Government's Exhibit 3: Copy of Lui's Hong Kong Passport; (4) Government's Exhibit 4: Copies of several forms of identification, including Lui's Hong Kong and Canadian Drivers Licenses ("Gov Ex. 4"); (5) Government's Exhibit 5: Copies of Lui's credit cards; (6) Government's Exhibit 6: Copies of Business Cards; (7) Government's Exhibit 7A: Letter from Lui's attorney, dated April 27, 1994, stating that Lui plans to return to Hong Kong in late May 1994 ("Gov.Ex. 7A"); (8) Government's Exhibit 7B: Letter from Lui's attorney, dated May 31, 1994, stating that due to unforeseen circumstances Lui will not return to Hong Kong for another eight to ten weeks ("Gov.Ex. 7B"); (9) Government's Exhibit 12: Affidavit of Anthony Alan Godfrey, an Investigating Officer with the Independent Commission Against Corruption in Hong Kong ("Aff. Godfrey ¶ ___"). At the detention hearing, Judge Karol heard testimony from Thomas B. Devlin, a Special Agent with the FBI, who arrested Lui at Logan Airport.
Lui introduced the following evidence at the hearing: (1) Defendant's Exhibit 8 through 10: Chinese Newspaper and Photographs; (2) Defendant's Exhibit 11: Letter from Lui's solicitor, dated October 26, 1994, stating that Lui was willing to meet with investigators in the Philippines to discuss the on-going investigation ("Def Ex. 11"); (3) Defendant's Exhibit 13: Affidavit of Fred Kiang ("Aff. Kiang ¶ ___"); (4) Defendant's Exhibit 14: Affidavit of Peter Chan ("Aff. Chan ¶ ___"); (5) Defendant's Exhibit 15: Affidavit of Koo Chun Shun Johnson; (6) Defendant's Exhibits 16.1 through 16.11: Attachments to Affidavits; and (7) Defendant's Exhibit 17: Affidavit of William P. Alfred, Professor of East Asian Studies at Harvard Law School.

**4.** Lui presented the following supplemental information: (1) Affidavit of Barry Egan, Barrister-at-Law in the Crown Colony of Hong Kong ("Aff. Egan ¶ ___"); (2) Affidavit of Lui Yuen Yee Ada Lee, Lui's wife, with attached copy of Canadian Airlines plane ticket ("Aff. Ada Lui ¶ ___"); and (5) Second Affidavit of Andrew Good, counsel for Lui.

The Government submitted two affidavits by Lena Chi Hui–Ling, Senior Assistant Crown Prosecutor in the Attorney General's Chambers, Prosecutions Division of the Hong Kong Government ("Aff. Chi ¶ ___"); ("Second Aff. Chi ¶ ___").

Island Ltd. ("GIL"), a Hong Kong export company. (Aff. Godfrey ¶¶ 4–11). GIL allegedly paid these sums in order to secure a monopoly over the export of certain brands of cigarettes. (Aff. Godfrey ¶¶ 4–11). Lui allegedly received approximately $3,000,000 in bribes. (Aff. Godfrey ¶ 11). Lui does not deny receiving this money, but asserts that it represented legitimate business income. Transcript of April 22, 1996 hearing at 31.

## III.

### JURISDICTION

Lui initially appealed Magistrate Judge Karol's detention order under D.Mass.Loc. Mag.R. 16(a), which provides:

> A decision or order by a magistrate, which, if made by a judge of the district court, could be appealed by the government or defendant under any provision of law, shall be subject to an appeal to a judge of the district court.

Rule 10 defines the scope of Rule 16(a) appeals:

> These rules [Rule 10 to Rule 16] govern the procedure and practice for the conduct of misdemeanor cases, including petty offenses or infractions, before United States magistrates under 18 U.S.C. § 3401, and or appeal in such cases to judges of the district court.

D.Mass.Loc.Mag.R. 10(a). Because Rule 16 is limited to misdemeanors and petty infractions, it does not apply to bail determinations in extradition cases. Moreover, 28 U.S.C.A. § 1291 (West 1995), which permits appeals of "final decision of the district courts," does not apply to the decisions of judicial officers sitting in extradition matters. *In re Extradition of Howard,* 996 F.2d 1320, 1325 (1st Cir.1993).

■■■ At its April 3, 1996 hearing, this court advised the parties of its conclusion that bail decisions in an extradition proceeding could only be challenged by a writ of habeas corpus, citing to *Koskotas v. Roche,* 740 F.Supp. 904, 918 (D.Mass.1990), *aff'd,* 931 F.2d 169 (1st Cir.1991). At that hearing, the parties agreed that this court should proceed under the premise that Lui challenges Magistrate Judge Karol's decision through a writ

of habeas corpus. And so, the court has converted Lui's Rule 16(a) appeal into a writ of habeas corpus, pursuant to 28 U.S.C.A. § 2241 (West 1995). *See, e.g., Argro v. United States,* 505 F.2d 1374, 1378 (2nd Cir.1974) (where parolee challenged revocation proceeding and sought admission to bail, appeal treated as habeas petition); *Caporali v. Whelan,* 582 F.Supp. 217, 219 (D.Mass.1984) (complaint seeking review of Immigration Naturalization Service's decision to detain deportee without bail construed as a petition for habeas corpus).

## IV.

### STANDARD OF REVIEW

#### A. "Reasonable Grounds" Review

■■■ The standard of review of a Magistrate Judge's bail determination in extradition cases is narrow. This court's inquiry is limited to the issue of whether or not there were reasonable grounds for the Magistrate Judge's denial of bail. *Koskotas,* 740 F.Supp. at 918. *See also Matter of Extradition of Russell,* 805 F.2d 1215, 1216 (5th Cir.1986) (district court properly applied the "reasonable grounds" standard to review the magistrate's bail decision in extradition case); *In re Extradition of Siegmund,* 887 F.Supp. 1383, 1385 (D.Nev.1995) (applying "reasonable grounds" standard to evaluate magistrates' findings regarding bail in extradition case). In applying this standard, the court defers to the Magistrate Judge's factual findings, unless they are unsupported by the record, but reviews the Magistrate Judge's legal determinations *de novo. See, e.g., Siegmund,* 887 F.Supp. at 1386 (evaluating *de novo* magistrate's finding that no special circumstances existed to grant bail in extradition case); *Duca v. United States,* No. CV 95–713 (DGT), 1995 WL 428636 at *16 (E.D.N.Y.1995) (same).

#### B. Introduction of New Evidence

At the April 3, 1996 hearing, and through additional written submissions, the parties

have proffered evidence that was not presented to Magistrate Judge Karol.[5] Lui has also proposed several conditions of release that were not presented to Magistrate Judge Karol. Moreover, in response to the Government's concern, this court held a further hearing on April 22, 1996 that focused in large part on Lui's financial resources.

■ Neither party has objected to the introduction of the new evidence. And the parties have at least implicitly urged this court to decide the reasonableness of Magistrate Judge Karol's bail determination by taking into account their respective proffers of new evidence. This court, therefore, will consider whether the record as a whole reasonably supports Magistrate Judge Karol's decision to detain Lui without bail. To do otherwise would be an unnecessary and wasteful replication of effort and resources.[6]

**5.** The Government has submitted the following evidence: (1) Affidavit of Jonathan Mayblum, General Counsel for the L.R. Co., the company responsible for managing the Devonshire Apartments, dated April 9, 1996; (2) Copy of the Lease for Apartment Number 912; and (3) Letter from Francis Fong, Director of the Royal Canada Trust Company, dated April 26, 1994 ("Royal Bank Letter"); (3) Affidavit of Roger Gordon McMeans; (4) Court Exhibit 1 with attachments A–G of Lui's bank accounts and net worth on May 1, 1993; (5) Court Exhibit 2 with attachments A–M of "Resources of Defendant Lui's Syndicate" ("Court Ex. 2–___").

Lui has submitted the following evidence: (1) Affidavit of Lillian Y. Pan, an attorney in Ontario, Canada; (2) Affidavit of Eddie Ho–Fan Chan ("Aff. Ho–Fan Chan ¶ ___"); (3) Affidavit of Dana M. Gurwitch, a paralegal at Silverglate & Good, describing the particulars of the Devonshire Apartments and specifically unit number 912; (4) Affidavit of Gia E. Barresi, a paralegal at Silverglate & Good, describing conversations she had with the Massachusetts Department of Corrections about the use of the electronic bracelet and video monitoring; (5) Appraisal Report of 21 Personna Blvd., Unionville, Ontario, prepared by Dr. Edward Lee; (6) Copy of a signed, but as of yet unratified, extradition treaty between the United States and the Philippines; (7) Proposed Waiver of Extradition Agreement; (8) Copy of the United States' treaty with the Philippines on Mutual Legal Assistance in Criminal Matters; (9) Third Affidavit of Andrew Good with attached letter from T.E. Whitchair, Jr., former Senior–Vice President of BAT, dated May 5, 1993; ("BAT Letter"); (10) Financial Declaration of Jerry Lui, dated April 10, 1996 ("Aff. Lui ¶ ___");

## V.

### STANDARD FOR BAIL IN EXTRADITION CASES

For individuals charged with *domestic crimes* in the United States, courts determine bail pursuant to the prescripts of the Bail Reform Act, 18 U.S.C.A. §§ 3141 et seq. (West 1985 & Supp. I 1996). Under its provisions, there exists a presumption in favor of bail. The Act mandates the "release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir.1985); 18 U.S.C.A. § 3142(c)(2).

■ But, the Bail Reform Act only applies to individuals charged with committing crimes within the United States. Its presumption in favor of bail, therefore, does not

(11) Report by David C. Raskin, Ph.D., of Polygraph evaluation conducted on Lui on April 9, 1996; (12) Second Affidavit of Gia Barresi Concerning Philippines and Canadian Extradition Treaties with Hong Kong, with attached letter from Frank Poon, Senior Crown Counsel of Attorney's General's Chambers International Law Division, Hong Kong, dated June 28, 1995; (13) Copy of Agreement Between the Government of Hong Kong and the Government of the Republic of the Philippines for the Surrender of Accused and Convicted Person, signed on January 13, 1995; (14) Copy of Agreement Between the Government of Hong Kong and the Government of Canada for the Surrender of Fugitive Offenders, signed on September 7, 1993; (13) Court Exhibit 3 Lui's Net Worth Statement with certified attachments 1–5 ("Court Ex. 3–___").

**6.** There exists no jurisdictional barrier preventing this court from considering such evidence. Federal courts have held that a habeas petitioner in an extradition appeal must be afforded the opportunity of a rehearing when he "proffers specific newly discovered explanatory evidence, previously unavailable through the exercise of reasonable diligence, and the evidence casts substantial doubt on the determination of probable cause." *Na–Yuet v. Hueston*, 690 F.Supp. 1008, 1011 (S.D.Fla.1988). *See also Peroff v. Hylton*, 563 F.2d 1099, 1101 (4th Cir.1977) (court considered newly discovered evidence in determining whether the original finding of probable cause was proper); *In Application of D'Amico*, 185 F.Supp. 925, 930–31 (S.D.N.Y.1960) (court reopened the petition and granted rehearing in light of evidence bearing on extraditability not previously offered).

apply to bail in extradition cases. *See, e.g., In re Extradition of Rouvier,* 839 F.Supp. 537, 539 (N.D.Ill.1993) (citing *Kamrin v. United States,* 725 F.2d 1225, 1227–28 (9th Cir.), *cert. denied,* 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984)); *In re Extradition of Nacif–Borgé,* 829 F.Supp. 1210, 1214 (D.Nev. 1993); *United States v. Hills,* 765 F.Supp. 381, 384 n. 5 (E.D.Mich.1991).

Nearly a century ago, the Supreme Court, in *Wright v. Henkel,* addressed the issue of bail in the context of extradition cases. 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903). *Wright,* a United States citizen, was arrested and detained, pursuant to an extradition request by Great Britain, to face charges of fraud. *Id.* at 40–41, 23 S.Ct. at 781. At the extradition hearing, Wright requested release on bail, claiming that incarceration would aggravate his illness. *Id.* at 42, 23 S.Ct. at 781–82. The extradition commissioner denied Wright's bail request. Wright appealed through a writ of habeas corpus. *Id.* The circuit court affirmed the commissioner's decision. Wright appealed unsuccessfully to the Supreme Court.

In rejecting Wright's request for bail, the Court noted that there existed no statute providing for bail in cases of foreign extradition. *Id.* at 61, 23 S.Ct. at 786. Rather, the Court opined that bail was inconsistent with the spirit and purpose of the extradition statute,[7] which provided that, if the commissioner finds the evidence sufficient at the extradition hearing, he "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made." *Id.* The Court explained that the demanding government, "when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted." *Id.* The Court noted that the same rationale applied to release on bail prior to the extradition hearing. *Id.*

Despite the Court's admonitions against bail, it did not hold that bail could never be granted in the extradition setting. Indeed, the Court stated:

> We are unwilling to hold that the circuit courts possess no power in respect of admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition, those courts may not in any case, and whatever the special circumstances, extend that relief.

*Id.* at 63, 23 S.Ct. at 787.

▮ By that language, the Supreme Court acknowledged the possibility of bail in extradition cases under special circumstances. Since *Wright,* it has become a well-settled principle that, while there is a presumption against bail in extradition cases, *Salerno v. United States,* 878 F.2d 317, 317 (9th Cir. 1989); *United States v. Leitner,* 784 F.2d 159, 160 (2nd Cir.1986); *Matter of Extradition of Russell,* 647 F.Supp. 1044, 1048 (S.D.Tex.1986), *aff'd,* 805 F.2d 1215 (5th Cir. 1986); *United States v. Taitz,* 130 F.R.D. 442, 444 (S.D.Cal.1990); *Beaulieu v. Hartigan,* 430 F.Supp. 915, 917 (D.Mass.1977), *vacated,* 554 F.2d 1 (1st Cir.1977), the presumption may be overcome where the person seeking release demonstrates (1) that "special circumstances" exist justifying his release and (2) that he does not pose a risk of flight. *Koskotas,* 931 F.2d at 175; *United States v. Williams,* 611 F.2d 914, 914–15 (1st Cir.1979); *Beaulieu,* 554 F.2d at 1.

▮ As the Supreme Court stated in *Wright,* the presumption against bail in extradition cases is intended to avoid the potential embarrassment to the United States Government of not being able to produce someone who has been ordered to be extradited. *Wright,* 190 U.S. at 60, 23 S.Ct. at 785–86. But, the importance of fulfilling such international obligations must be balanced with an individual's right to due process. As this court recognized in *Beaulieu,* the "special circumstances" doctrine of *Wright,* though still viable, "must be viewed, in the light of modern concepts of fundamental fairness, as providing a district judge with

---

**7.** The court relied on section 5270 of the Revised Statutes, 1901 U.S. Comp. Stat 3591. The language of section 5270 substantially mirrors today's extradition statute, 18 U.S.C.A. § 3184.

flexibility and discretion in considering whether bail should be granted in these extradition cases." *Beaulieu,* 430 F.Supp. at 917.

## VI.

## APPLICATION OF BAIL EXTRADITION STANDARDS

Guided by these standards, the court now turns to the particular facts of Lui's case. In considering the grant of Lui's habeas writ, the court must determine: (1) whether there exist special circumstances that justify Lui's release on bail; and (2) whether the record reasonably supports Magistrate Judge Karol's conclusion that Lui presents a flight risk and that no conditions of release can reasonably assure his presence at future proceedings. The court addresses each of these considerations in turn.

### A. Special Circumstances

At the detention hearing, Lui argued that at least two special circumstances exist which justify his release on bail: (1) Hong Kong's reversion in fourteen months raises complex legal issues that will extend the extradition process beyond the date when the Treaty with Hong Kong will expire; and (2) the likelihood that, even if extradited within the next fourteen months, it will be the PRC, and not the United Kingdom, that will try and/or punish him.

Magistrate Judge Karol rejected Lui's argument that the length and complexity of his case constitutes a "special circumstance." In doing so, he stated that bail is not warranted whenever there exist complex legal issues that threaten to prolong the extradition process, rather, "bail may be warranted where the requesting authority is not prepared to go forward with the extradition hearing after having a reasonable time to prepare...." Magistrate's Opinion at 8 ("Opn. __"). The Magistrate then found that even if complexity and length was a special circumstance, this case was not "particularly complex" because Lui's argument on reversion is not a legal question but rather a political question better left to the Secretary of State. (Opn. 8–9).

This court respectfully concludes that the Magistrate Judge's opinion misses the point.

 It is undisputed that Hong Kong's reversion to the PRC on July 1, 1997, will extinguish the United States' authority to extradite individuals to Hong Kong. If these extradition proceedings are still pending at that time, the Government will have no choice but to release Lui, after needlessly subjecting him to approximately one and one-half years in jail. Lui contends that there exists a substantial likelihood of delay due to the complexity of the legal issues surrounding his extradition and that this delay constitutes a "special circumstance." This court agrees.

The possibility of delay and the complexity of the extradition proceedings are factors that courts have found to be special circumstances. In *Williams,* the First Circuit stated that special circumstances may include a delayed extradition hearing. 611 F.2d at 915. The Ninth Circuit in *Salerno* held that raising substantial claims upon which appellant has a high probability of success and an unusual delay in the appeal process can also constitute special circumstances. 878 F.2d at 317. *See also Siegmund,* 887 F.Supp. at 1385–86 (special circumstances include an unusual delay in the appeals process and raising substantial claims upon which appeals have a high probability of success); *Taitz,* 130 F.R.D. at 445 (delay because of complexity of factual issues at extradition hearing was a special circumstance justifying release on bail).

Here, the likely delay in finalizing the extradition process is a particularly compelling circumstance, given the reality that the Treaty terminates in fourteen months. This has been and will continue to be a hotly contested case. Its resolution will go from Magistrate Judge Karol and then by way of writs to this court, the First Circuit and potentially the Supreme Court.

Moreover, this is not a simple extradition case. Here, Lui will mount a three pronged attack against his extradition. First, he will dispute the factual allegations in the complaint, arguing that there does not exist probable cause to extradite him. Second, Lui will challenge the validity of the Treaty

as it applies to extradition cases in post-reversion Hong Kong. Finally, he will challenge the constitutionality of the extradition statute itself on separation of powers grounds. In fact, the Government has conceded that this case raises many issues and, therefore, the proceedings may well be protracted. Transcript of Magistrate Judge's Hearing at 65 ("Mag. Tr.—").

 Lui contends, that even if he is extradited before reversion, he will likely be tried and, most assuredly, punished by the PRC. (Second Aff. Chi ¶ 3; Aff. Egan ¶¶ 12–25). Lui argues that his extradition cannot take place under the Treaty if he stands to be tried or punished by the PRC after reversion.

A sovereign's right to obtain extradition of an individual is created by treaty. *Factor v. Laubenheimer*, 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933). Where there is no treaty, the requested sovereign has no duty to extradite. *Id.* In fact, "no branch of the United States government has any authority to surrender an accused to a foreign government except as provided for by statute or treaty." *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir.1986), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

Here, Lui contends that the terms of the Treaty prohibit his extradition to a sovereign not a party to the Treaty. Article XII of the Treaty provides:

(1) a person extradited shall not be detained or proceeded against in the territory of the requesting Party, for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted, or on account of any other matters, *nor be extradited by that Party to a third state-*

 (a) until after he has returned to the territory of the requested Party; or

(b) until the expiration of thirty days after he has been free to return to the territory of the requested Party.

28 U.S.T. at 233 (emphasis added). Based on this language, Lui presents two important and complicated legal questions with which Magistrate Judge Karol and subsequent appellate courts must grapple:

(1) Whether the Treaty authorizes extradition when the sovereign who requests extradition will not be the sovereign who tries the accused? and

(2) Whether the Treaty authorizes extradition when the sovereign who requests extradition will not be the sovereign who punishes the accused?

The resolution of these issues requires analyzing the terms of the Treaty, the parties intent in entering the Treaty, and the general prohibition against extraditing an individual to a country with whom the United States does not have an extradition treaty. As the First Circuit has not addressed these issues, there is a potential for a circuit split on an important and novel legal question, which could prompt the Supreme Court to grant certiorari.[8]

The pending constitutional challenge to the extradition statute, section 3184, will also delay Lui's extradition. In *Lobue v. Christopher*, 893 F.Supp. 65 (D.D.C.1995), the court held that section 3184 violated the separation of powers doctrine by conferring on the Secretary of State authority to review the legal conclusions of extradition judges. Presently, *Lobue* is on appeal to the United States Court of Appeal for the District of Columbia Circuit. Since *Lobue*, other district courts have found section 3184 to be constitutional. *See, e.g., Carreno v. Johnson*, 899 F.Supp. 624, 632 (S.D.Fla.1995) (finding that section 3184 did not violate separation of powers doctrine). The constitutionality of section 3184 is a question that the First Circuit has yet to address.[9] This court concludes that

---

8. In 1988, the Ninth Circuit rejected a claim similar to Lui's. *See Oen Yin–Choy v. Robinson*, 858 F.2d 1400, 1403–1404 (9th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989) (finding that fact that Crown Colony of Hong Kong would revert to the PRC in 1997 did not mean that extradition of fugitive to Hong Kong would result in his extra-

dition to a third state in violation of terms of extradition treaty). *Oen* was decided in 1988, without the approaching reality of reversion, and only dealt with the issue of punishment.

9. Two courts have specifically found that the probable delay associated with the present constitutional challenge to section 3184 was a spe-

these legal issues will add to delay of Lui's potential extradition, thus, increasing the likelihood that Lui's extradition will not occur before July 1, 1997.

Other cases dealing with complex extradition issues have also taken substantial time to conclude. *See, e.g., Koskotas,* 931 F.2d at 171 (in case where contention made that treaty prohibited extradition because alleged offense was "of a political character," twenty-nine months passed from the date of arrest to the final extradition order); *In re Extradition of Howard,* 996 F.2d 1320 (1st Cir.1993) (twenty-one months for challenge to extradition to the United Kingdom based on potential for racial bias, involving legal issue whether amended extradition treaty allowed for direct appeal of magistrate's decision); *Oen Yin-Choy v. Robinson,* 858 F.2d 1400, 1402 (9th Cir.1988) (nineteen months for challenge to extradition to Hong Kong based on the claim that extradition violated treaty because the accused would be punished by the PRC and not by the United Kingdom), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989); *Taitz,* 130 F.R.D. at 445–446 (court found that challenge to whether a particular offense, not specifically enumerated in treaty, was an extraditable offense would likely last as long as two years).

Here, the consequences of Lui's "special circumstances" are more predictable and certain than those cases dealing only with the abstract issue of substantial delay based on the complexity of the legal issues. In this case, the reality is that Lui will be released if his final extradition order does not occur by June 30, 1997. And so, if he is denied bail, Lui will be incarcerated for a period of fourteen months, in addition to the time he has already served, even though there exists a substantial likelihood that his extradition will not take place.

This court, therefore, concludes that the probability for substantial delay in the resolution of the extradition proceedings, and the near certainty of Lui's release if he is not extradited before July 1, 1997, constitutes a unique, compelling, and special circumstance

cial circumstance. *See In re Extradition of Sidali,* 899 F.Supp. 1342, 1351 (D.N.J.1995); *In re*

that justifies Lui's release on bail. And so, the court must release Lui on bail if the record supports the conclusion that conditions exist that can reasonably assure his presence at future proceedings.

## B. Risk of Flight

■ Although the Bail Reform Act is not controlling in extradition cases, its standards for evaluating an individual's risk of flight provide a useful frame of reference:

The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including—(a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C.A. § 3142(g).

■ Because there exists a presumption against bail in extradition cases, one seeking release must rebut this presumption by demonstrating that he is a "tolerable bail risk." *See Williams,* 611 F.2d at 915. This burden can be met in two ways: (1) by establishing that he does not present a risk of flight, or (2) by demonstrating that there exist conditions of release that will reasonably assure

*Extradition of Morales,* 906 F.Supp. 1368, 1375 (S.D.Cal.1995).

his presence at future proceedings. Applying these standards, the court now turns to Magistrate Judge Karol's findings on Lui's risk of flight.

In his opinion, Magistrate Judge Karol concluded that Lui is not a "tolerable bail risk" because (1) he "poses a very serious risk of flight," and (2) the proposed security arrangements are inadequate to reasonably assure his appearance at future proceedings. (Opn. 6–8). The record as a whole cannot reasonably support these conclusions.

The Magistrate Judge based his conclusion that Lui "poses a very serious risk of flight" on Lui's lack of ties to the community, his considerable wealth, and his "strong aversion to returning to Hong Kong." (Opn. 6–8). Also significant to the Magistrate Judge was Lui's "sudden departure from Hong Kong in 1994," and his decision to relocate his family and business to the Philippines—"a country with which Hong Kong has no extradition treaty and to which he would dearly like to return." (Opn. 6–7). The Magistrate Judge stated that "but for Lui's own decision to flee Hong Kong in April 1994 rather than stay and answer his accusers, the underlying criminal proceeding might be nearly—if not entirely—complete by now." (Opn. 9).

And so, Judge Magistrate Karol's primary rationale for concluding that Lui poses a very high risk of flight rests on the assumption that Lui suddenly left Hong Kong in 1994 and relocated his family and business in the Philippines to avoid extradition to Hong Kong. The record does not support these core assumptions.

Lui was born in Hong Kong in November 1954. (Gov.Ex. 4). A Canadian educated businessman, he is married and has two young children, both of whom are Canadian citizens. (Aff. Ada Lui ¶¶ 1–3). Since at least 1988, Lui has worked as a senior officer of BAT, assuming the position of Commercial Director in Hong Kong in 1991. (Aff. Godfrey ¶ 8).

In 1990, Lui and his wife began the process of becoming Canadian citizens. (Aff. Ada Lui ¶ 2). The reason for their decision, according to the unrefuted affidavit of Mrs. Lui, is that:

We, like a very large number of Hong Kong residents, understood the political implications of the coming reversion of Hong Kong to People's Republic of China.

(Aff. Ada Lui ¶ 2). In 1991, Lui and his wife purchased a residence in Toronto, Canada. (Aff. Ada Lui ¶ 2). Presently, the Lui family, in the name of Ada Lui, own two apartments in Toronto, Canada. (Aff. Lui ¶ 5). Lui and his wife became Canadian citizens in June 1994. (Aff. Ada Lui ¶ 2). Presently, Mrs. Lui and the two children reside in Hong Kong, waiting for their daughter to finish high school. Transcript of April 3, 1996 hearing at 41 ("Tr. ___"). They live in the family apartment in Hong Kong, which is valued at approximately 1.9 million dollars. (Court Ex. 3–1). The Government of Hong Kong has a lien on this property. (Aff. Lui ¶ 5).

Lui worked for BAT in Hong Kong until his resignation in May of 1993. (BAT Letter; Aff. Godfrey ¶ 8). Prior to his resignation, Lui began preparations to open up a trading company in the Philippines. (BAT Letter). Lui thereafter became a partner of the Subic International Cargo Center, Inc. ("SICCI"), a trading company located in Subic Bay, Philippines. (Aff. Ho–Fan Chan ¶¶ 1–3; Court Ex. 2–K). The Government's evidence indicates that SICCI was incorporated on May 19, 1993 and that Lui became a primary partner in the company with approximately a 35 per cent interest in the issued stock. (Court Exh. 2–K). SICCI is involved in the warehousing and shipping of cigarettes in Asia. (Aff. Ho–Fan Chan ¶ 1). Chan's unrebutted affidavit indicates that SICCI was established in the Philippines because of its favorable business atmosphere and its free political system. (Aff. Ho–Fan Chan ¶ 2).

The Independent Commission Against Corruption ("ICAC") began their investigation into Lui's activities, as well as other charges of alleged impropriety at BAT, after Chui To-yan, a former employee of GIL, began providing information to ICAC. (Aff. Godfrey ¶ 13). Chui resigned from GIL in April 1993, but it is unclear from the record

when he began assisting ICAC. (Aff. Godfrey ¶ 13).[10]

Lui was out of the country when ICAC agents visited his home on April 26, 1994 with the intent of arresting him. (Aff. Godfrey ¶ 15). There is no evidence in the record that the ICAC's agents communicated their intent to arrest Lui to either him, his wife, or his attorneys. The agents were informed that Lui was on an overseas business trip, and that he would return in late May. (Aff. Godfrey ¶ 15). At the end of May 1994, ICAC agents received information from Lui's attorney that Lui had extended his trip for an additional eight to ten weeks. (Gov's Ex. 7B). There is no evidence presented by either party that Lui returned to Hong Kong after April 1994.

On October 26, 1994, Lui's solicitor, sent a letter to ICAC indicating that Lui "is very pleased and prepared to meet your investigators in the place he has committed for business reason[s] in [the] company of representative[s] of this firm." (Def.Ex. 11). ICAC agents attempted to visit Lui in the Philippines. (Aff. Godfrey ¶ 17). It is unclear from the record why this meeting did not take place.

On January 23, 1995, a Hong Kong magistrate issued a warrant for Lui's arrest. (Aff. Godfrey ¶ 16). On December 12, 1995, another warrant for Lui's arrest, with additional charges, was issued in Hong Kong. (Aff. Godfrey ¶ 18).

By the time the ICAC agents came to Lui's Hong Kong residence in April 1994, his new company in the Philippines, SICCI, had been underway for about a year.[11] Prior to his arrest on December 20, 1995, Lui managed the day-to-day business operations of SICCI, including shipping, warehousing, financing, accounting, and customer relations. (Aff. Ho–Fan Chan ¶ 3).

Lui and his family spent the entire summer of 1995 in Canada. (Aff. Ada Lui ¶ 2). In December 1995, the Lui family planned a trip to Boston, Massachusetts to visit a friend of the family, who had been in a coma since being struck by a car. (Aff. Chan ¶ 2).[12] Lui left the Philippines on December 19, 1995. (Aff. Ada Lui ¶ 4). Lui arrived in Toronto, Canada the next day, where the record suggests that he met his wife and his children. The Lui family then flew to Boston. (Aff. Ada Lui ¶ 4). ICAC agents learned of Lui's trip and contacted United States authorities, who arrested Lui upon his arrival at Logan Airport in Boston. (Mag Tr. 6–10).

Lui told the FBI agents that he had come from the Philippines, and provided his Philippines address to them when asked where he lived. (Mag Tr. 12). The address was 1034 NSD Compound, Subic Bay, Philippines. (Mag. Tr. 12). When Pre–Trial Services in-

---

10. Besides assisting ICAC in their investigation of BAT, Chui also provided information relating to an on-going smuggling operation of cigarettes to China and Taiwan that was being carried out by GIL. (Aff. Godfrey ¶ 13). The smuggling charges do not concern Lui. (Aff. Godfrey ¶ 14).

A number of persons have been charged in relation to various alleged improprieties at GIL. (Aff. Godfrey ¶ 19). Some of the charges have been reviewed and withdrawn following the murder in Singapore of Chui. (Aff. Godfrey ¶ 19). There is absolutely no evidence in the record that Lui had anything to do with Chui's death, or in fact, had any knowledge of his demise.

The Godfrey affidavit states that "throughout the corruption and smuggling investigation, Lui [with others] have worked as a group in order to secure and protect the interests of the syndicate, that is the lucrative cigarette smuggling business." (Aff. Godfrey ¶ 31). The affidavit, however, does not describe any conduct by Lui that in any way interfered with ICAC's investigation.

11. The Government has introduced a letter from Francis Fong, the Director of the Royal Bank of Canada Trust Company, dated April 26, 1994, addressed to another employee of the company. (Royal Bank Letter). In the letter, Fong states that he had discussions with Lui concerning offshore discretionary trust accounts. The letter states that Lui planned to return to Hong Kong "for good" after he and his wife received their Canadian passports. (Royal Bank Letter).

12. Lui purchased his airline ticket for the trip on December 11, 1995 from Canadian Airlines International. (Aff. Ada Lui ¶ 5). A copy of the attached ticket indicates, that after spending three days in Boston, Lui planned to return to Canada, where he would stay until January 6, 1996. (Attachment to Aff. Ada Lui). He then planned to fly to Xiamen, a city in the PRC, with connections through Tokyo and Manilla. On the 9th of January, he planned to return to Manila. The ticket also indicates that there was an open flight from Manila to Hong Kong.

terviewed Lui the next day, he provided both his Canadian and Philippine addresses. (Tr. 89).

 Based on the above evidence, the court concludes that the record does not reasonably support the inferences drawn by Magistrate Judge Karol to the effect that, after April 1994, Lui and his family abruptly established permanent residence and a business in the Philippines to avoid the possibility of extradition to Hong Kong. First, Lui was not even in Hong Kong when the ICAC agents came to his residence in April 1994, and there is no evidence that he knew these agents were coming. Second, Lui started SICCI in the Philippines in May of 1993, one year before ICAC agents tried to contact him, and approximately twenty months before any warrant was issued for his arrest. Third, there is no evidence to indicate that Lui left Hong Kong to start SICCI for any reason other than to pursue a legitimate business opportunity. Fourth, Lui did not relocate his family to the Philippines after April 1994. In fact, Mrs. Lui and the Lui children presently live in their Hong Kong apartment. Moreover, there is no evidence that would warrant any inference by Magistrate Judge Karol that Lui knew, one way or the other, about any extradition agreement between Hong Kong and the Philippines. It certainly would be unreasonable to charge Lui with having such knowledge, particularly given the lack of information on the subject demonstrated at the April 3 and April 22 hearings by both counsel and by this court.

The evidence, of course, does establish that Lui did not return to Hong Kong since April 1994. Indeed, Lui freely admits that he does not want to return to Hong Kong. But, any notion that Lui presents a high risk of flight because he has this "strong aversion to returning to Hong Kong", (Opn. 6), draws an unreasonable inference from that aversion. *See Nacif–Borge*, 829 F.Supp. at 1221 (court did not consider accused's desire not to return to country that sought his extradition in evaluating his risk of flight); *Matter of the Extradition of Morales*, 906 F.Supp. 1368, 1376 (S.D.Cal.1995) (same).

In every contested extradition case, the person to be extradited does not want to return to the country that seeks his presence to face criminal charges. If mere aversion to return to face charges could be considered as a surrogate for a finding of risk of flight, then bail would never be available in a contested extradition case. Indeed, if aversion to return were the test as to risk of flight, then the opportunity for a bail hearing in contested extradition cases would be a sham.

Lui's activities after April 1994 are inconsistent with someone who poses a high risk of flight. First, Lui did not sell his 1.9 million dollar apartment in Hong Kong, as he might well have done if he intended to flee. Second, he left over $125,000 in Hong Kong banks, subjecting that money to the potential of Government liens, which in fact occurred. (Court Ex. 3–3, 4). Third, at no time did Lui conceal his identity or his location. Fourth, Lui voluntarily and openly exposed himself to the possibility of extradition by spending an entire summer in Canada and by traveling to the United States to visit a sick friend in Boston. Lui's predilection for flight in light of this demonstrated conduct is negligible at best.

Furthermore, Lui's alleged crime is not one of violence. A husband and father of two, Lui manages a large corporation, and has no history of any drug or alcohol problems. At the time of Lui's arrest, he was not on probation, parole, or any other form of custodial release. Moreover, Lui has no criminal record in any country, and has never previously been accused of committing a crime. Lui also has the support of his family and friends, so much so that his brother-in-law, a doctor in Canada, is willing to put up his family's house as security to ensure Lui's presence at future proceedings. Finally, a friend who lives in Newton, Massachusetts has consented to have Lui remain at his house twenty-four hours a day during the extradition proceedings.

### C. Conditions Assuring Presence

At the detention hearing before Magistrate Judge Karol, Lui proposed the following conditions of release: (1) Lui would remain in his apartment at One Devonshire Place in Boston, Massachusetts twenty-four hours per

day; (2) Lui would remain in the custody of security officers to prevent his escape; (3) Lui would wear an electronic monitoring bracelet, at his expense, and under conditions prescribed by Pre–Trial Services; (4) Lui would surrender all his passports; (5) Lui would report twice daily by telephone to Pre–Trial Services; (6) Lui would pay for the rent to his apartment, the costs of the security guards, and the telephone service; and (7) any other conditions that the court would impose as necessary.

After finding risk of flight, Magistrate Judge Karol turned to Lui's proposal of hiring private security at a residential apartment house as a way to assure his appearance at future proceedings.[13] The Magistrate Judge rejected the notion that a court should go out of its way to set up a set of conditions of release just because a person can pay for such conditions. Putting aside these concerns, he found that the proposed conditions were inadequate to ensure Lui's presence at future proceedings. In doing so, the Magistrate Judge stated that:

> [A] residential apartment building is simply not designed to meet the unique security needs of a detention facility, and private security guards do not necessarily receive the same specialized training in escape prevention as professional corrections officers. Nor are such guards likely to have comparable levels of experience in dealing with escape schemes. In any event, they are certainly less accountable, if at all, for their errors and omissions.

(Opn. 7).

But, in his opinion, Magistrate Judge Karol does not discuss Lui's other proposed conditions of release, specifically the efficacy of an electronic monitoring defense system. Moreover, he does not discuss the possibility for cash bail or the posting of any other security arrangement.[14]

Magistrate Judge Karol's opinion seems to suggest that the proposed security arrange-

ments are inadequate, because they do not provide the same degree of protection of a detention facility. *See* (Opn. 7) ("A residential apartment building is not designed to meet the unique security needs of a detention facility . . . ."). Lui does not have to show that the proposed conditions offer the same degree of protection of a detention facility. Rather he must show that there exists conditions of release that will reasonably assure his presence at future proceedings given his risk of flight.

■ The Magistrate Judge's failure to consider the use of the electronic monitoring bracelet was a serious omission, calling into question the overall reasonableness of his evaluation. That point is underscored by examining the First Circuit's opinion in *United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In *O'Brien*, the First Circuit evaluated whether a set of conditions of release were adequate to ensure the defendant O'Brien's presence at future proceedings where he posed a high risk of flight. O'Brien was charged with trafficking in cocaine in violation of the Controlled Substances Act, 21 U.S.C.A. §§ 801 et seq. (West 1985). *Id.* at 810. O'Brien appeared before a magistrate and the government moved for his pretrial detention pursuant to 18 U.S.C.A. § 3142(f)(1) and (2). *Id.* Because O'Brien was charged with violating the Controlled Substances Act, the normal presumption in favor of bail did not apply. *Id.* at 814–15. Instead, under 18 U.S.C. § 3142(e), there is a rebuttable presumption that no conditions or combination of conditions exists that would reasonably assure a defendant's appearance where there is a probable cause to believe that "the person committed an offense for which the maximum term of imprisonment of ten years or more is prescribed in the Controlled Substance Act." *Id.* at 815. Under this standard, the presumption serves to shift the burden of production and to require that the defendant introduce "some evidence" to the contrary. *Id.* (*citing United States v. Jessup*, 757 F.2d 378, 381 (1st Cir.1985)).

---

**13.** This court does not consider the use of private security guards, finding that such a proffer is unnecessary to assure Lui's presence at future proceedings.

**14.** Lui's attorneys have indicated that the posting of bail or other security was not available at the time of the detention hearing.

At O'Brien's detention hearing, the Magistrate Judge found that O'Brien presented a serious risk of flight. *Id.* at 811. O'Brien argued, however, that the use of an electronic monitoring bracelet, as well as the posting of his wife's residence as security would adequately assure his presence at future proceedings. *Id.* at 811–12. Because O'Brien did not present evidence on the effectiveness of the bracelet, the Magistrate Judge found that he had failed to rebut the presumption that there were no conditions or combination of conditions of release, that would reasonably assure his appearance. *Id.* at 812. O'Brien moved for reconsideration of the order based on newly submitted evidence of the effectiveness of the electronic monitoring bracelet. *Id.* After examining the evidence, the Magistrate Judge found that the bracelet "was an effective technology for notifying Pretrial Services and the United States's office promptly when a defendant has fled. Further, it appears to deter a defendant from attempting to flee." *Id.* at 811.

With the additional evidence of the bracelet as well as the posting of the house as security, the Magistrate Judge concluded that O'Brien had rebutted the presumption of flight and found that a combination of conditions existed that could reasonably assure his appearance. *Id.* The government appealed the Magistrate Judge's decision to the District Court. *Id.* The District Court affirmed O'Brien's release, but added two additional conditions: (1) that O'Brien would report daily to pre-trial services; and (2) random announced visits would be made to his home by Pre–Trial Services. *Id.* at 810.

On appeal, the First Circuit affirmed the District Court, finding that the effectiveness of the bracelet and the additional conditions of release rebutted the presumption of flight. *Id.* at 816. In describing the effectiveness of the bracelet, the First Circuit held that:

> The bracelet itself had been used in fourteen districts to date, with about 200 defendants. Five persons have fled while on the bracelet. Two were caught within a week, one is believed to have been killed, and the others were never caught. Some of the 200, including one who fled, were monitored by a passive bracelet that is less

effective than the active bracelet involved here.... These figures indicate that about two and one half percent of those with the electronic bracelet have fled. The national figure for those who flee of all those released is three to four percent.

*Id.* at 815.

*O'Brien* is instructive for three reasons. First, the court found that the electronic bracelet was approximately 97.5% effective in deterring flight. *Id.* Second, the court found that the bracelet, in addition to some sort of bond, was adequate to assure the presence of a defendant with a very high risk of flight. *Id.* at 816. Third, the court found that O'Brien had fulfilled his burden in rebutting the presumption against bail by offering the proposed conditions. *Id.*

The significance of Magistrate Judge Karol's failure to weigh the effectiveness of electronic monitoring in his bail decision is further underscored by a Pre–Trial Services memorandum to this court on the use of the electronic monitoring bracelet, dated April 5, 1996:

> Electronic monitoring is provided by BI, Inc, through a national contact with the Administrative Office of the U.S. Courts. BI provides the electronic monitoring equipment and twenty-four hour monitoring from their headquarters in Boulder, Colorado. Electronic monitoring equipment consists of transmitter, worn around the ankle of the client, and a receiver which attaches to the telephone. If the defendant moves more than 150 feet from the receiver, the receiver notifies the monitoring service that the defendant is out of range ... The receiver and transmitter maintain near constant contact with one another. The receiver randomly telephones the mainframe computer at the monitoring center to report that the equipment is functioning properly. Likewise, the mainframe randomly telephones the receiver to ensure that the equipment is functioning, and that the telephone service is operating properly. The equipment will report any attempt to tamper with the receiver or the transmitter and will also report interruptions in power. The receiver contains backup batteries in the event of

a power outage and also contains memory in the event the phone service is interrupted. The receiver will continue to record events such as out of range or tamper signal while telephone service is interrupted and, when service is restored, will transmit those events to the central monitoring mainframe computer. In order for the equipment to function properly, call waiting and call forwarding must be removed as well as answering machines or fax machines.

At the April 3, 1996 hearing, Lui proposed three additional conditions: (1) the posting of $500,000 cash bond, immediately forfeitable upon Lui's failure to appear for any court date; (2) Lui's brother-in-law, Dr. Edward Lee, will execute an agreement with the Clerk, conveying title to his residence in Ontario, Canada, estimated value $200,000, that will allow the Clerk to immediately sell the residence if Lui fails to appear for any court date; and (3) as an alternative to confining Lui in the Devonshire apartments, Bernard Leung and his wife have given their consent for Lui to remain in their home in Newton, Massachusetts twenty-four hours per day, with electronic monitoring. (Tr. 49–52).

In response to the court's request, Lui filed a proposed order of release on April 8, 1996, which was amended at the April 22, 1996 hearing. The order included the conditions presented to Magistrate Judge Karol as well as the new conditions proposed to this court on April 3, 1996. It also included several additional conditions of release: (1) the execution of a waiver of extradition applicable to any country to which he may flee; (2) Lui's consent to have Pre-Trial Services make unannounced visits to the Newton residence; and (3) pursuant to a request by this court, Lui also offers his stock certificates in SICCI, valued at approximately $450,000, as additional security. At the April 22, 1996 hearing, Lui also proposed that his wife would post an additional $800,000 dollars as security, as well as the deeds to the two apartments in Canada.

In order to determine whether there exist a set of conditions that will reasonably assure Lui's presence at future proceedings, it is relevant to inquire into Lui's finances. *See United States v. Patriarca*, 948 F.2d 789, 794 (1st Cir.1991) (holding that without knowledge of defendant's assets it would be impossible for a judicial officer to arrive at a forfeiture amount which "could reasonably assure compliance").

At the court's request, Lui submitted a sworn financial statement outlining his assets and expenses. Lui claims his assets are as follows:

### Lui's Business Assets

As director of SICCI, Lui received approximately $150,000.00 during 1995 as a director's fee from the company. (Aff. Lui ¶ 3). He expects to receive approximately the same amount for 1996. (Aff. Lui ¶ 3). As part-owner of SICCI, Lui also received $350,000.00 in distributed profits in 1995, and he estimates that his share of the profits to be the same for 1996. (Aff. Lui ¶ 3). Lui predicts that his total income from SICCI for 1996 will come to approximately $450,000.00. (Aff. Lui ¶ 3). Lui also has stock certificates in SICCI, valued at approximately $450,000.00. (Aff. Lui ¶ 5).

### Lui's Personal Assets

Lui and his wife have approximately $775,000 in a family trust account in the Royal Bank of Canada–Channel Islands. (Aff. Lui ¶ 5). There is also $500,000 in a Boston bank account. (Aff. Lui ¶ 5). There is an additional $125,000 deposited in several Hong Kong banks, which have been frozen by the Hong Kong government. (Court Ex. 3–3, 4).

Lui and his wife own an apartment in Hong Kong, worth approximately $1,923,077. (Court Ex. 3–1). The equity in the apartment is approximately $1,164,295.00. (Aff. Lui ¶ 5). Lui cannot offer this investment as security because the Hong Kong government has placed a lien against the property. (Aff. Lui ¶ 5). Lui's wife also owns two rental apartments in Canada, with a combined value of $340,000 of which $170,000 is equity. (Aff. Lui ¶ 5).

*Lui's Expenses*

The mortgage debt service for the Hong Kong apartment is $70,000 per year and the cost of supporting his family is approximately $50,000 per year. (Aff. Lui ¶ 4). Lui's projected gross income for 1996 exceeds his projected expenses by $330,000. Lui, however, has already exceeded that amount in legal fees and other costs associated with his extradition. (Aff. Lui ¶ 5). Lui estimates that legal fees and costs to continue at the rate of approximately $100,000 per month. (Aff. Lui ¶ 5).

Based on the information in the financial statement and the evidence at the April 22, 1996 hearing, the court concludes that Lui's total reported available net worth comes to approximately $1,725,000.[15] Of this amount, Lui pledges $500,000 in cash bond and his SICCI stock, worth $450,000, for a total of $950,000. This amount represents fifty-five percent of Lui's total available net worth. Moreover, Mrs. Lui offers an additional $800,000 plus the two apartments in Canada as further security.

This court concludes that record does not reasonably support Magistrate Judge Karol's conclusion that Lui is a flight risk and that no conditions of release can reasonably assure his presence at future proceedings. To the contrary, this court concludes that Lui is not a flight risk and that the proffered conditions discussed above do reasonably assure his presence at future proceedings.

## VII.

### CONCLUSION

For the reasons discussed above, this court concludes that special circumstances exist warranting Lui's release on bail, and that the proffered conditions of release reasonably assure his presence at future proceedings.

An order will issue.

### ORDER

For the reasons stated in the accompanying memorandum, the court hereby orders Lui's release from the Plymouth County Correctional Center under the following conditions:

1. Mr. Lui shall post cash bail in the amount of one million three hundred thousand U.S. dollars ($1,300,000.00) with the Clerk of the United States District Court for the District of Massachusetts (the "Clerk"), immediately forfeitable to the Clerk if Mr. Lui fails to appear for any scheduled court appearance. Said monies shall be deposited by the Clerk in an interest bearing account during the pendency of the extradition proceedings;

15. In evaluating Lui's finances, the Government urges that the court should not only look to Lui's own assets but also to "the resources that are available to Lui as a result of his role in a larger international syndicate." (Court Exh. 2 at 1).

The First Circuit has held that, in considering bail, it is proper take into account the resources of the criminal organization of which the defendant is a part. *See United States v. Dillon*, 938 F.2d 1412, 1416–17 (1st Cir.1991) ("Although appellant's father indicates that he will post his home as security for bail, it is reasonable to infer, for detention purposes, that the drug organization to which appellant belongs, should it choose to assist him in relocating, probably could absorb the loss of $200,000 worth of security."); *United States v. Palmer–Contreras*, 835 F.2d 15, 18 (1st Cir.1987) ("The large amount of drugs supports the court's inference (for detention purposes) that defendants are connected to persons or an organization with great financial resources, an organization which could finance defendants' relocation. The forfeiture of $100,-000 worth of property would have little financial impact on such an organization.").

The above line of cases, however, are easily distinguished from this case for the simple reason that in those cases the defendants' conduct was manifestly illegal (possession of drugs). Moreover, the amount of drugs found in the defendants' possession (seven million dollars in *Palmer–Contreras* and four million dollars in *Dillon*), allowed the inference that the defendants were involved in large drug organizations, which in turn, permitted the courts to consider the financial resources of such organizations in determining whether the defendants' proposed security arrangements were adequate.

Here, there is no contraband demonstrating criminal activity, or that, Lui is involved in a criminal organization that will finance his flight from justice. Furthermore, Lui admits accepting the money from GIL. The receipt of that money, however, is presumed legitimate unless the Government can show otherwise. Accordingly, the court finds that the assets of Lui's associates are not relevant in determining whether Lui should be released on bail.

2. Mr. Lui's brother-in-law, Dr. Edward Lee, shall execute an agreement with the Clerk that secures Dr. Lee's residence, located at 21 Personna Boulevard, Unionville, Ontario, Canada, under the established procedures of the Clerk in the posting of such property. If Mr. Lui fails to appear at any scheduled conference, the Clerk shall sell said property and keep the proceeds of the sale;

3. Mr. Lui shall execute an agreement with the Clerk posting his stock certificates in the Subic International Cargo Center, Inc. Such stock shall be immediately forfeitable if Mr. Lui fails to appear for any scheduled court appearance;

4. Mrs. Lui shall execute an agreement with the Clerk that secures the two apartments in Toronto Canada, owned by Mrs. Lui, under the established procedures of the Clerk in the posting of such property. If Mr. Lui fails to appear at any scheduled conference, the Clerk shall sell said properties and keep the proceeds of the sales;

5. Mr. Lui is to be confined at all times to the residence of Bernard and Susan Leung at 11 Charles River Terrace, Newton Highlands, Massachusetts, under the standard conditions of Electronic Monitoring as administered by Pre-Trial Services;

6. Pre-Trial Services, the FBI, or the United States Marshal may make unannounced visits to Mr. Leung's residence at any time;

7. Mr. Lui shall surrender his Canadian and Hong Kong passports; and

8. Mr. Lui shall sign an agreement waiving extradition should he violate the terms of his release under this court's order.

Mr. Lui shall not be released from custody until Pre-Trial Services certifies to this court that all of the above conditions have been satisfied and that the telephone service has been properly configured for electronic monitoring. In addition, the court stays Lui's release until April 30, 1996 at 12:00 p.m. to provide the Government with the opportunity to appeal.

IT IS SO ORDERED.

*ORDER*

If Pre-Trial Services in Boston is notified by BI that a signal from the electronic monitor indicating flight has been received, and a telephone call has confirmed flight, it shall notify the United States Marshal for the District of Massachusetts. The Marshal, pursuant to this Order, shall initiate a fugitive investigation to apprehend Petitioner Jerry Lui. In such a circumstance, the Marshal shall notify the Court no later than the next business day of the initiation of the fugitive investigation and obtain a formal arrest warrant for violation of conditions of release.

IT IS SO ORDERED.