**George KOSKOTAS,**
**Petitioner, Appellant,**

v.

**James B. ROCHE, etc.,**
**Respondent, Appellee.**

No. 90–1738.

United States Court of Appeals,
First Circuit.

Heard Sept. 10, 1990.
Decided April 30, 1991.

Mitchell R. Berger, with whom Ronald S. Liebman, Charles E. Talisman, Michael S. Maurer and Patton, Boggs & Blow, were on brief, Washington, D.C., for petitioner, appellant.

Victor A. Wild, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief, Boston, Mass., for respondent, appellee.

Before CAMPBELL and CYR, Circuit Judges, and COFFIN, Senior Circuit Judge.

CYR, Circuit Judge.

Petitioner-appellant George Koskotas challenges a district court order denying habeas corpus relief from an order of extradition to the Hellenic Republic of Greece for criminal prosecution. We affirm.[1]

## I

## BACKGROUND

"The Koskotas Affair" was part of the notorious political scandal which led to the ouster of Greek Prime Minister Andreas Papandreou and PASOK, the controlling political party. In November 1988, shortly after the scandal erupted, Koskotas fled Greece; first to Brazil and then to the

---

1. The district court opinion is reported as *Koskotas v. Roche,* 740 F.Supp. 904 (D.Mass.1990).

United States. Koskotas, former chairman, managing director and majority owner of the Bank of Crete ("Bank"), was taken into federal custody on November 25, 1988, in the District of Massachusetts, pursuant to a provisional arrest warrant issued at the request of the Government of Greece under the provisions of the Treaty of Extradition between the United States of America and the Hellenic Republic (otherwise referred to as "Greek–American Extradition Treaty" or "Treaty"). The arrest warrant directed that Koskotas be held for extradition to Greece to answer to charges of illicit appropriation and forgery, for allegedly funneling huge amounts of embezzled monies to Greek government officials in return for political favors to the Bank.

The extradition request was referred to a United States magistrate judge who found sufficient evidence to warrant extradition under the Treaty. *See In re Extradition of Koskotas*, 127 F.R.D. 13 (D.Mass.1989). The extradition order was approved by the United States District Court, subject to minor amendment, and the amended certification of extraditability and order of extradition was entered July 25, 1990. Koskotas filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2253, and now appeals the district court order dismissing the section 2253 petition.

## II

## DISCUSSION

### Standard of Review

■ As an order of extradition is not a "final order" and direct review is therefore unavailable, *In re Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir.1989) (per curiam), *cert. denied*, ——— U.S. ———, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990), limited appellate review may be obtained only on a petition for writ of habeas corpus, *Collins v. Miller*, 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920). The review avail-

able under 28 U.S.C. § 2253 is not meant to be "a means for rehearing what the magistrate already decided." *Manzi*, 888 F.2d at 205 (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)). "[H]abeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty, and ... whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez*, 268 U.S. at 312, 45 S.Ct. at 542; *see also Manzi*, 888 F.2d at 205; *Romeo v. Roache*, 820 F.2d 540, 542–543 (1st Cir.1987).

### *"Political Offense"*
### *Exception Claim*

■ Koskotas does not challenge the magistrate judge's jurisdiction, but relies principally on the contention that the offenses with which he is charged in Greece are "of a political character," hence not extraditable offenses "within the treaty."[2] *See Quinn v. Robinson*, 783 F.2d 776, 787 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); *Eain v. Wilkes*, 641 F.2d 504, 512 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). In order to come within the "political offense" exception, Koskotas must meet the so-called "incidence" test, by demonstrating that the alleged crimes were "committed in the course of and incidental to a violent political disturbance such as a war, revolution or rebellion." *Eain*, 641 F.2d at 518; *Escobedo v. United States*, 623 F.2d 1098, 1104 (5th Cir.), *cert. denied*, 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980); *Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir.1980); *In re Ezeta*, 62 F. 972, 977–1002 (N.D.Cal. 1894). "The [political offense] exception does not apply to political acts that involve less fundamental efforts to accomplish change or that do not attract sufficient adherents to create the requisite amount of turmoil," nor to common crimes connected

---

**2.** Article III of the Treaty explicitly provides that:

[t]he provisions of the present Treaty shall not import a claim of extradition for any crime or offense of a political character, nor for acts

connected with such crimes or offense.... The State applied to, or courts of such State, shall decide whether the crime or offense is of a political character.

but tenuously to a political disturbance, as distinguished from criminal acts "causally or ideologically related to [an] uprising." *Quinn*, 783 F.2d at 807, 809. *See also Ornelas v. Ruiz*, 161 U.S. 502, 511, 16 S.Ct. 689, 692, 40 L.Ed. 787 (1896) (considering the character of the foray, mode of attack, persons killed and kind of property taken, "acts which contained all the characteristics of crimes under the ordinary law" were not "political offenses").

Koskotas distorts both the relevant Greek political landscape and the purpose of the "political offense" exception, by characterizing as a violent uprising what plainly is an electoral conflict tainted by allegations of political corruption.[3] According to Koskotas, Greece was, and remains, in the midst of a violent "constitutional revolt" pitting PASOK party members against their political opposition. Koskotas attempts to demonstrate that the financial crimes with which he is charged were at once part and parcel of PASOK's effort to eliminate its political opposition and a precipitating cause of the sometimes violent retaliation against PASOK.

The "political offense" exception historically has embraced only offenses aimed either at accomplishing political change by violent means or at repressing violent political opposition.[4] The exception is "applicable only when a certain level of violence exists and when those engaged in that violence are seeking to accomplish a particular objective." *Quinn*, 783 F.2d at 897; *see also Escobedo*, 623 F.2d at 1104 (kidnapping of Cuban consul for alleged purpose of ransoming political prisoners in Cuba, not "political offense" because not "committed in the course of and incidental to a violent political disturbance").

Criminal conduct in the nature of financial fraud, even involving political corruption, traditionally has been considered outside the "political offense" exception. *See, e.g., Sindona*, 619 F.2d at 173 (fraudulent bankruptcy, even if "it resulted from political maneuverings and is pursued for political reasons," not an offense of a political character); *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976) (embezzlement by public official, "not in any sense a political offense"); *Garcia–Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972) (financial crimes by Peruvian public official, not political offenses); *Jiminez v. Aristeguieta*, 311 F.2d 547, 560 (5th Cir.1962), *cert. denied*, 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963) (financial crimes by former chief executive of Venezuela, not political offenses).

Significantly, Koskotas alleges neither an intention to promote violent political change nor an intention to repress violent political opposition. Indeed, Koskotas ascribes no political motive for the criminal conduct with which he is charged. *See In re Doherty*, 599 F.Supp. 270, 277 n. 7 (S.D. N.Y.1984) (an otherwise political act could be deprived of its political character if committed for "purely personal reasons"). The "political offense" exception has never been extended to offenses which prompt others to engage in violent uprisings. The traditional limits of the "political offense" exception do not extend coverage to the criminal offenses filed against Koskotas.

 Koskotas contends, nonetheless, that the alleged offenses are within the

---

**3.** The record reveals that PASOK was replaced in free elections and that the Greek judicial system is addressing related allegations of political corruption. *See Koskotas*, 127 F.R.D. at 21; *Koskotas*, 740 F.Supp. at 912 n. 12.

**4.** The "incidence" test was first defined in *In re Castioni*, [1891] 1 Q.B. 149 (1890), when Great Britain refused to extradite a Swiss citizen who had killed a government official, because "the man was acting as one of a number of persons engaged in acts of violence of a political character with a political object, and as part of the political movement and [up]rising in which he was taking part." *Id.* at 159 (Denman, J.). *Castioni* is the source of the "incidence" test adopted in American jurisprudence. The first use of the test in a United States court involved the refusal to extradite Salvadoran citizens who allegedly committed murder and robbery in an unsuccessful attempt to put down a revolution. *In re Ezeta*, 62 F. 972 (N.D.Cal.1894). For further historical background on the "incidence" test, see *Quinn*, 783 F.2d at 792–803.

"political offense" exception under the Greek–American Extradition Treaty, which we should treat as a source of law unto itself. *See Greci v. Birknes*, 527 F.2d 956, 958–959 (1st Cir.1976) (interpreting Italian–American Extradition Treaty in light of its language and the circumstances of its adoption). Relying principally on *In re Extradition of Mylonas*, 187 F.Supp. 716 (N.D.Ala.1960), Koskotas asserts that the "political offense" exception has been accorded broader interpretation under the Greek–American Extradition Treaty than under other extradition treaties.

The *Mylonas* court refused to extradite a former unit commander in the Greek Civil War for financial crimes allegedly committed after the war. Even though there was no evidence that Mylonas's alleged crimes were prompted by ideological motives, the court considered it sufficient that the prosecution was brought about by Mylonas's political enemies. Similarly, Koskotas asserts that his alleged financial crimes were causally connected to the political turmoil prevailing in Greece and that the prosecution constitutes retaliation by his political opponents.[5]

We can discern no sound basis in authority or reason for the dissonant interpretation of the "political offense" exception urged by Koskotas under the Greek–American Extradition Treaty. The "political offense" exception in the Greek–American Extradition Treaty is couched in language ("offense of a political character") which is identical to that in other extradition treaties to which the United States is a signato-ry. It has been held that this same language, in the Italian–American Extradition Treaty, imports the traditional "political offense" exception test. *See, e.g., Sindona*, 619 F.2d 167; *In re Extradition of Pazienza*, 619 F.Supp. 611 (S.D.N.Y.1985).

*"Rule of Non–Inquiry"*

■ Koskotas claims that the district court should have refused extradition because the motives of the Greek government and the probable consequences of extradition are "antipathetic to a federal court's sense of decency." *Rosado v. Civiletti*, 621 F.2d 1179, 1195 (2d Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980) (quoting *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.1960)). Koskotas acknowledges that United States courts, including our own, *see Manzi*, 888 F.2d at 206, generally have held that the motives of the requesting government, *see Quinn*, 783 F.2d at 789; *In re Lincoln*, 228 F. at 74, and the procedures and treatment awaiting the relator upon extradition, *Quinn*, 783 F.2d at 790; *Arnbjornsdottir–Mendler v. United States*, 721 F.2d 679, 683 (9th Cir.1983); *Sindona*, 619 F.2d at 174–175; *Peroff v. Hylton*, 563 F.2d 1099, 1102 (4th Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977); *Garcia–Guillern*, 450 F.2d at 1192, are matters for the Executive Branch rather than the Judicial Branch, *see Manzi*, 888 F.2d at 206 (citing cases applying rule of non-inquiry).

Relying on *Gallina v. Fraser*, 278 F.2d 77, Koskotas contends that the rule of non-

---

**5.** We are unpersuaded that *Mylonas* is analogous authority, as it was no ordinary political corruption case. Mylonas fought against the Communists in the Greek Civil War. The Communists executed members of his family and destroyed his home. *Mylonas*, 187 F.Supp. at 718. The court found that the extradition request by the Communist government was "incidental to, formed a part, and was the aftermath of political disturbances," *i.e.*, the Greek Civil War. *Id.* at 721. We conclude, as did the district court, that Koskotas, in attempting to analogize his case to that of Mylonas, "stretch[es] [his own] case beyond recognition." *Koskotas*, 740 F.Supp. at 912.

Finally, we find *Mylonas* unpersuasive insofar as it adopts a different interpretation of the "political offense" exception than that tradition-ally recognized (*i.e.*, as regards its apparent reliance on the political motivations of those *requesting extradition*). *Mylonas* treats the "political offense" exception issue as a secondary holding and then but briefly, *Mylonas*, 187 F.Supp. at 721, and it is contrary to the weight of authority. *See, e.g., Sindona*, 619 F.2d at 173–174 ("politically motivated" prosecution would not render offense "political"); *Garcia–Guillern*, 450 F.2d at 1192 (political nature of offense is determined by the circumstances attending the alleged crime, "not by the motives of those who subsequently handle the prosecution"); *Jhirad*, 536 F.2d at 485; *Ramos v. Diaz*, 179 F.Supp. 459 (S.D.Fla.1959); *In re Lincoln*, 228 F. 70, 73–74 (E.D.N.Y.1915), *aff'd. per curiam*, 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916).

inquiry is not absolute.[6] He points as well to *Manzi*, 888 F.2d at 206, where we applied the rule of non-inquiry but noted that there was no indication that the relator's safety was threatened. The inapposite *obiter dicta* in *Gallina* and *Manzi* offer no support for Koskotas's contention that the district court should have considered whether extradition would be so antipathetic to its sense of decency as to require reexamination of the rule of non-inquiry. Koskotas may raise these concerns with the Secretary of State, *see* 18 U.S.C. § 3186, but not with the Judicial Branch.

Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts. *See Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir.1990); *Jhirad*, 536 F.2d at 484–485. The customary rule of non-inquiry, *see In re Lincoln*, 228 F. 70, is firmly rooted in comity considerations as well. Concerns of the sort raised here are for the "executive branch because of its exclusive power to conduct foreign affairs," *Manzi*, 888 F.2d at 206; *see also Escobedo*, 623 F.2d at 1105, as extradition proceedings " 'necessarily implicate the foreign policy interests of the United States,' " *Escobedo*, 623 F.2d at 1105 (quoting *Peroff*, 563 F.2d at 1102).

For these reasons "the Secretary of State has *sole discretion* to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a

political crime...." *Quinn*, 783 F.2d at 789 (emphasis added); *see also In re Lincoln*, 228 F. 70. Similarly, "the degree of risk to [the relator's] life from extradition is an issue that properly falls within the *exclusive purview* of the executive branch." *Ahmad*, 910 F.2d at 1066 (quoting *Sindona*, 619 F.2d at 174) (emphasis added); *see also Peroff v. Hylton*, 542 F.2d 1247, 1249 (4th Cir.), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977).

## Due Process

Koskotas next claims that various procedural irregularities and adverse judicial rulings raise fundamental due process concerns.

■■■ First, he contends that procedural due process was disregarded when the provisional arrest warrant was supplemented to encompass new charges and additional evidence.[7] Koskotas concedes that the terms of the Treaty neither preclude nor authorize submissions of supplemental evidence or new charges beyond the two-month period prescribed in Article XI, but he urges that the requirements of procedural due process bar supplementation. Koskotas adverts to a special provision in the Greek–American Extradition Treaty which allows an accused to be provisionally arrested, without a probable cause showing, merely upon issuance of an arrest warrant by the Greek government. Therefore, he insists, the two-month release provision in Article XI of the Treaty must be strictly construed against the Government of Greece.[8]

The provisional arrest warrant was executed on November 25, 1988. The formal requisition for surrender was filed January 20, 1989. The provisional arrest warrant was supplemented on March 20, 1989, the same date the government presented its supplemental evidence.

---

**6.** *Gallina* did not depart from the rule of non-inquiry. The court merely observed that it could "imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of [the rule of non-inquiry]." *Gallina*, 278 F.2d at 79.

**7.** Article XI of the Treaty provides in relevant part:

The person provisionally arrested, shall be released, unless within two months from the date of ... commitment in the United States, the formal requisition for surrender with the documentary proofs hereinafter prescribed be made as aforesaid by ... the demanding Government....

**8.** Koskotas complains that some of the supplementary evidence was unlawfully obtained by the Greek government through the issuance of a letter rogatory to a federal court in New York. Since the evidence was used in a domestic extradition proceeding, Koskotas argues that the letter rogatory violated 28 U.S.C. § 1782, which limits the use of letters rogatory to the obtaining of evidence for "use in a proceeding in a foreign or international tribunal." As the magistrate found, however, the evidence was in fact for-

The Supreme Court has cautioned that the courts are to construe extradition treaties "more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor v. Laubenheimer*, 290 U.S. 276, 298, 54 S.Ct. 191, 197, 78 L.Ed. 315 (1933). *See also Fernandez*, 268 U.S. at 312, 45 S.Ct. at 542 ("[f]orm is not to be insisted upon beyond the requirements of safety and justice"). Koskotas did not demonstrate to the district court anything approaching a substantial failure to comply with the statutory extradition procedure, let alone a fundamental due process violation. Although we "recognize[ ] that serious due process concerns may merit review beyond the narrow scope of inquiry in extradition proceedings," *Manzi*, 888 F.2d at 206, we discern no serious due process issue where the demanding government merely supplements evidence which was sufficient in the first instance to sustain the provisional arrest warrant, *cf. Greci*, 527 F.2d at 960–961 (at hearing to reconsider extradition, magistrate "may receive additional or corroborative documents, if such are deemed necessary").

Similarly, we are persuaded to the Eleventh Circuit view that "the warrant *may* specify *all* the charges if the requesting country so chooses, but it *need* refer to only *one*." *Hill v. United States*, 737 F.2d 950, 952 (11th Cir.1984) (emphasis added).

Within sixty days of the execution of the provisional arrest warrant, Koskotas was informed of most of the evidence; more than two months before the extradition hearing he was informed of all the evidence and all the charges. These procedural irregularities raised no fundamental due process concerns.

▮ Koskotas claims that he was deprived of a fair opportunity to defend himself due to various adverse rulings, including denial of bail to permit him to assist in the preparation of his defense, denial of a stay of the extradition proceedings pending resolution of civil proceedings in New York relating to the freezing of his assets, and

denial of certain discovery requests. These claims are without merit as well.

▮ First, "[i]n a case involving foreign extradition, bail should not be granted absent 'special circumstances,' " *United States v. Williams*, 611 F.2d 914 (1st Cir. 1979), and both the district court and the magistrate supportably determined that there were no "special circumstances." Second, as the district court correctly observed, requests to stay extradition " 'are properly addressed to the executive branch, which is empowered to make the final decision on extradition and has assumed the discretion to deny or delay extradition on humanitarian grounds.' " *Koskotas*, 740 F.Supp. at 920, (quoting *Sindona*, 619 F.2d at 176). Third, in an extradition proceeding, discovery is not only discretionary with the court, it is narrow in scope. *See Jhirad*, 536 F.2d at 484. Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, *Collins v. Loisel*, 259 U.S. 309, 315–317, 42 S.Ct. 469, 471–72, 66 L.Ed. 956 (1922); *Charlton v. Kelly*, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Jiminez*, 311 F.2d at 556, contradictory evidence properly may be excluded, *Charlton*, 229 U.S. at 461, 33 S.Ct. at 949; *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). While the line between "contradictory" and "explanatory" evidence is not sharply drawn, the purpose of permitting explanatory evidence is to afford the relator "the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." *Matter of Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y.1978). On the other hand, it is well-established that "extradition proceedings are not to be converted into a dress rehearsal trial." *Jhirad*, 536 F.2d at 484; *see also Quinn*, 783 F.2d at 817 n. 41. There has been no

---

warded not by virtue of a letter rogatory but pursuant to an order of a judge of the United States District Court for the Southern District of New York. Hence, Koskotas's claim is without merit. *See Koskotas*, 127 F.R.D. at 26.

showing that denial of discovery was an abuse of discretion.[9]

### Probable Cause

Finally, Koskotas claims error in the probable cause determinations respecting the illicit appropriation and forgery charges, on the ground that the evidence failed to establish an essential element of each offense. Our limited review of the required probable cause determination, *see* 18 U.S.C. § 3184; *Benson v. McMahon*, 127 U.S. 457, 462–463, 8 S.Ct. 1240, 1242–43, 32 L.Ed. 234 (1888), inquires "whether there is any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Manzi* at 205 (quoting *Fernandez*, 268 U.S. at 312, 45 S.Ct. at 542). The probable cause determinations were sound.

### (i) Forgery

■ Under the law of Greece, the crime of forgery requires an intent to use the forgery to defraud another concerning a fact which may have legal significance.[10] Koskotas maintains that the Greek government failed to establish probable cause as to an essential element of the crime of forgery, since the criminal warrant does not aver, and there is no evidence, that the alleged forgery, a purported Merrill Lynch financial document, was altered with intent to defraud. We disagree.

The probable cause determination was based not only on the alleged forgery but on twelve sworn affidavits attesting that Koskotas caused the purported Merrill Lynch document, reflecting wire transfers in the names of various persons in the Greek government, to be delivered to the Greek government. The putative wire transfers were denied in sworn affidavits filed by each of the alleged transferors, whose affidavits were substantiated by documentation obtained from Merrill Lynch. Although the affiants address only the injury to their reputations and do not explicitly impute to Koskotas an intent to defraud, the magistrate judge correctly concluded that their characterization of the charges is without legal significance. *Koskotas*, 127 F.R.D. at 24.

More to the point, the evidence was illuminating enough, as it indicated that between 1986 and 1988 Koskotas relieved the Bank of Crete of several million dollars which he invested in time deposit accounts with Merrill Lynch "for the benefit of George and Kathy Koskotas." We conclude that the evidence established probable cause that Koskotas forged the Merrill Lynch document with intent to impede investigation into the alleged embezzlement. *See supra*, note 10.

### (ii) *Illicit Appropriation*

■ Koskotas asserts that there was no probable cause to believe that he misappropriated funds from the Bank of Crete in the United States, as a January 1989 audit of the Bank revealed that the funds were never in the United States. On the other side of the evidence ledger, however, the magistrate judge found that Bank records reflect that these funds were on deposit in two New York financial institutions, Irving Trust Company and Merrill Lynch, and that Koskotas represented to auditors, with supporting documentation, that the funds on

---

**9.** We refuse further consideration of these claims as Koskotas proposes no basis for overturning the challenged rulings, beyond the simple assertion that the relief requested is not precluded by the Treaty. *See, e.g., United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied,* ——— U.S. ———, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990) (it is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Moreover, we conclude, as did the district court, *Koskotas*, 740 F.Supp. at 919, that the claim that Koskotas was deprived of the right to defend himself "stretch[es] the bounds of credibility," especially since three prominent law firms entered special appearances for Koskotas below and $1,400,000 has been released for his legal defense, *see Bank of Crete, S.A. v. Koskotas*, 733 F.Supp. 648, 655 (S.D.N.Y.1990).

**10.** Under the Hellenic Republic of Greece Criminal Code, ch. 10, art. 216(a)(1),(2), "forgery" is committed by:

1. One who executes a forged document or one who alters a document, or who uses the same;
2. With intent to use it to defraud another;
3. Concerning a fact which has legal significance.

deposit in these institutions belonged to the Bank.[11] Subsequent investigation disclosed that the funds were not deposited in the name of the Bank of Crete, as Koskotas had represented to the auditors, but were deposited in Koskotas's name and used by him.

The ultimate import of the January 1989 audit, along with all other evidence, is a matter for the trier of fact in Greece. *See Peroff*, 542 F.2d at 1249. The required probable cause hearing entails no determination of the guilt or innocence of the relator, but only whether there is "competent legal evidence which ... would justify [the relator's] apprehension and commitment for trial if the crime had been committed in that state." *Collins*, 259 U.S. at 314–315, 42 S.Ct. at 471. The probable cause determination was supported by sufficient evidence.

*Affirmed.*

***

11. Koskotas contends that he did not misappropriate monies from the Irving Trust and Merrill Lynch accounts, but used these accounts merely to conceal funds misappropriated from the Bank of Crete in Greece. *See Koskotas*, 740 F.Supp. at 914.