# United States Court of Appeals
## For the First Circuit

No. 13-2444

ALEXANDER HILTON,

Petitioner, Appellant,

v.

JOHN KERRY, United States Secretary of State; ERIC H. HOLDER,
United States Attorney General; JOHN GIBBONS, United States
Marshal, District of Massachusetts,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

Monica R. Shah, with whom Norman Zalkind and Zalkind Duncan &
Bernstein LLP were on brief, for appellant.
Theodore B. Heinrich, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellees.

June 12, 2014

**LYNCH, Chief Judge**.  This is an appeal from a denial of a habeas corpus petition asking the court to block extradition.

Upon receiving an official request from the United Kingdom, the United States sought extradition of Alexander Hilton, a United States citizen, to face an attempted murder charge in Scotland.  Hilton argued that, because of his mental health problems, he may not be extradited because extradition would cause him an increased risk of suicide, and so violate his Fifth Amendment right to due process under the United States Constitution.  In addition, Hilton argued that he may not be extradited because trial under the Scottish jury system requires only a simple majority for conviction and that would violate his U.S. constitutional rights.[1]  After a hearing, a magistrate judge found Hilton extraditable and issued a Certificate of Extraditability.  See 18 U.S.C. § 3184.

Hilton then filed a petition for a writ of habeas corpus, seeking to block extradition.  See 28 U.S.C. § 2241; see also In re Extradition of Howard, 996 F.2d 1320, 1325 (1st Cir. 1993) (explaining that "neither party to an extradition proceeding may challenge a decision rendered therein by direct appeal").  The district court denied the petition.  See Hilton v. Kerry,

---

[1]  Hilton also alleged a derivative violation of this country's treaty obligations under the United States-United Kingdom extradition treaty, Extradition Treaty Between the United States of America and the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc. No. 108-23.

No. 13-11710-TSH, 2013 WL 5755485 (D. Mass. Oct. 22, 2013). We affirm the district court.

I.

A.        Allegations

Hilton attended the University of St. Andrews in Scotland from September 2009 through March 2011. United Kingdom authorities allege that on or about March 5, 2011, Hilton attempted to murder a fellow student, Robert Forbes, by spiking a bottle of wine with methanol, giving the bottle to Forbes, and encouraging him to drink the contents. Because of Hilton's continuous encouragement, the allegations continue, Forbes drank most of the contents of the bottle. Forbes was later hospitalized. According to the request for extradition, a treating neurologist "is of the opinion that if [Forbes] had not received medical treatment then he may have sustained kidney failure or other neurological deficit. Due to the high levels of acid in his blood this would have resulted in his death." Forbes is alleged to have lost initially his eyesight as a result of the incident, though it has since improved. Forbes continues to require and receive medical treatment.

Following the incident, police recovered evidence that Hilton had purchased a plastic funnel and glass measuring jug from a local store. In addition, police recovered Hilton's laptop, analysis of which showed that a user had on March 7, 2011 -- two days after the poisoning but two days before Forbes' condition was

-3-

diagnosed -- accessed web pages containing information regarding methanol poisoning and the long term effects thereof. In addition, analysis showed that, on an unknown date, a user had conducted Google search for "methanol mixed with ethanol."

Scottish authorities interrogated Hilton for five hours on March 11, 2011 but did not charge him at that time. On March 15, 2011, Hilton sought and received a leave of absence from St. Andrews, citing, among other things, his personal and medical circumstances (see infra). Hilton left Scotland and returned to his home in Massachusetts on March 22, 2011. On October 11, 2012, the British Embassy submitted a diplomatic note formally requesting that Hilton be extradited. Hilton was charged with attempted murder in Scotland, and a warrant for his arrest was issued on December 2, 2012. On February 12, 2013, the United States filed a complaint seeking an arrest warrant and the extradition of Hilton. Hilton was arrested on February 13, 2013.

B.      Hilton's Mental Health Problems

Hilton, now age 22, has a long history of mental illness including suicidal thoughts and ideation. According to Dr. Judith G. Edersheim, a psychiatrist retained by Hilton's counsel to evaluate Hilton, Hilton suffers from "a primary psychotic disorder, a primary disorder of thought," with diagnostic considerations pointing to schizophrenia, delusional disorder, or generalized psychotic disorder.

-4-

After his arrest, Hilton was transferred to Wyatt Detention Facility. Immediately, Hilton began to engage in suicidal behaviors. Officials placed Hilton on suicide watch. His attorneys report that Hilton became increasingly despondent, refusing nutrition. While detained, Hilton also expressed overt psychotic thoughts, including auditory, visual, and tactile hallucinations.

In Dr. Edersheim's opinion, Hilton's suicidal thoughts and ideations worsen whenever he is away from his home and the set of supports his family has put in place. She opines further that extradition to Scotland would greatly increase Hilton's risk of suicide.

C.        Extradition Proceedings and Bail

Ten days after his arrest, Hilton filed a motion to permit visits from his treating psychologists. The Government assented, and, based upon a showing of medical necessity, the magistrate judge granted the motion the same day. Around the same time, Hilton filed a motion for release from custody on bail pending extradition proceedings, arguing, among other things, that his psychiatric illness was severely exacerbated as soon as he was placed in custody. After a hearing, the magistrate judge found that special circumstances existed overriding the presumption against granting bail in extradition proceedings and that Hilton

did not pose a serious risk of flight or danger to the community. She ordered him released on conditions on March 4, 2013.[2]

The magistrate judge held an extradition hearing on March 7, 2013. On May 3, 2013, she issued a decision finding Hilton extraditable to Scotland and, soon after, a Certificate of Extraditability. The decision found that Hilton conceded that a valid treaty exists between the United States and the United Kingdom, that the charged crime of attempted murder is covered by the treaty, and that probable cause exists for the charged crime. Relying upon the rule of non-inquiry, the decision rejected Hilton's argument that, by subjecting him to Scottish criminal procedure, extradition would violate his constitutional rights and, as a consequence, certain provisions of the extradition treaty. The decision also rejected Hilton's argument that extradition should be barred on humanitarian grounds, reasoning that, under the federal extradition statute, such considerations were properly addressed to the Secretary of State. The magistrate judge ordered a stay of the Certificate of Extraditability so that Hilton could diligently pursue a habeas petition.

---

[2] Hilton's current release is set to end upon the termination of habeas proceedings. In the extradition proceedings below, the magistrate judge appears to have left open whether, under the extradition statute, she retains authority to order release for the period after habeas proceedings have terminated but prior to extradition. The Government has not challenged before this court the earlier order granting release. We do not address the issue.

D.        Habeas Proceedings

Hilton filed a petition for a writ of habeas corpus on July 16, 2013, again seeking to prevent his extradition. See 28 U.S.C. § 2241. In his petition, Hilton claimed first that extradition should be blocked because of certain features of Scotland's criminal procedure, and second that extradition would violate his constitutional rights because of the risk he would commit suicide if extradited. Hilton, 2013 WL 5755485, at *2-3. The district court denied Hilton's petition on October 22, 2013. Id. at *5. The court rejected Hilton's claim for relief based upon Scotland's jury system, reasoning that the rule of non-inquiry prevented it from looking into the fairness of the procedures that await Hilton if he is extradited. Id. at *2-3. The district court also rejected Hilton's claim based upon his mental health issues, observing that "humanitarian concerns, such as the one Hilton raises, surrounding extradition are exclusively within the purview of the Secretary of State." Id. at *4. Hilton had argued that his mental health claim was predicated on an alleged violation of his due process rights, as opposed to humanitarian concerns, citing Plaster v. United States, 720 F.2d 340, 348 (4th Cir. 1983) and In re Burt, 737 F.2d 1477, 1482-87 (7th Cir. 1984). The district court reasoned, however, that, "[u]nlike [in] Plaster and Burt, in Hilton's case there is no action by the United States beyond the extradition proceeding that might violate Hilton's due process

rights." <u>Hilton</u>, 2013 WL 5755485, at *4. The district court ordered a stay of its decision denying habeas relief pending appeal.

## II.

The United States judiciary has a limited role in extradition proceedings. "Extradition is an executive, not a judicial, function." <u>Martin</u> v. <u>Warden, Atlanta Pen</u>, 993 F.2d 824, 828 (11th Cir. 1993). "Because extradition is a creature of treaty, 'the power to extradite derives from the President's power to conduct foreign affairs.'" <u>Ordinola</u> v. <u>Hackman</u>, 478 F.3d 588, 606 (4th Cir. 2007) (quoting <u>Sidali</u> v. <u>I.N.S.</u>, 107 F.3d 191, 194 (3d Cir. 1997)); <u>see</u> <u>U.S. Const.</u> art. II, § 2, cl. 2; <u>see generally</u> <u>United States</u> v. <u>Curtiss-Wright Export Corp.</u>, 299 U.S. 304, 315-22 (1936).

As such, "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." <u>Lopez-Smith</u> v. <u>Hood</u>, 121 F.3d 1322, 1326 (9th Cir. 1997), <u>superseded by regulation on other grounds as recognized by</u> <u>Cornejo-Barreto</u> v. <u>Seifert</u>, 218 F.3d 1004 (9th Cir. 2000). A judicial officer who presides over an extradition proceeding "is not exercising 'any part of the judicial power of the United States,'" <u>In re Extradition of Howard</u>, 996 F.2d at 1325 (quoting <u>In re Kaine</u>, 55 U.S. (14 How.) 103, 120 (1852)), but instead "acts in

-8-

a non-institutional capacity by virtue of a 'special authority,'" id. (quoting In re Metzger, 46 U.S. (5 How.) 176, 191 (1847)).

A.          Federal Extradition Statute

Extradition proceedings in the United States are governed by statute. See 18 U.S.C. § 3184. "The statute establishes a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State." United States v. Kin-Hong, 110 F.3d 103, 109 (1st Cir. 1997) (footnote omitted). Once a formal complaint is filed, the judicial officer[3] must determine whether there is an extradition treaty between the United States and the relevant foreign government and whether the crime charged is covered by that treaty. 18 U.S.C. § 3184. Assuming both questions are answered in the affirmative, the judicial officer issues a warrant for the arrest of the individual sought for extradition (commonly referred to as the "relator"). Id. If a warrant issues, the judicial officer then conducts a hearing to determine whether "the evidence [is] sufficient to sustain the charge under the provisions of the . . . treaty." Id. If it is, the judicial officer "shall certify" to the Secretary of State that a warrant for the surrender of the named individual "may issue." Id. (emphases added). The judicial officer must also

---

[3]     "[A]ny justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State" may serve as the judicial officer. 18 U.S.C. § 3184.

provide to the Secretary of State a copy of all testimony and evidence from the extradition hearing.  Id.

The statute commits to the sole discretion of the Secretary of State the ultimate decision of whether to extradite. See id. § 3186 ("The Secretary of State may order the person committed under section[] 3184 . . . to be delivered to any authorized agent of such foreign government, to be tried for the offense . . . charged." (emphasis added)).  "The Secretary may . . . decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations." Kin-Hong, 110 F.3d at 109.  In addition, the Secretary may attach conditions to the relator's release.  See Jimenez v. U.S. Dist. Court for S. Dist. of Fla., Miami Div., 84 S. Ct. 14, 19 (1963) (Goldberg, J., chambers opinion) (denying stay of extradition and describing commitments made by Venezuelan government to United States Department of State as a condition of surrender of fugitive).

B.      Rule of Non-Inquiry

Judicial involvement in the extradition process is also constrained by the "rule of non-inquiry."  "[T]his doctrine bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters."  Khouzam v. Att'y Gen. of U.S., 549 F.3d 235, 253 (3d Cir. 2008); see also Munaf v. Geren, 553 U.S.

674, 700 (2008) ("Such allegations are of course a matter of serious concern, but in the present context that concern is to be addressed by the political branches, not the judiciary."); Glucksman v. Henkel, 221 U.S. 508, 512 (1911) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair."); Neely v. Henkel, 180 U.S. 109, 123 (1901) ("In the judgment of Congress these [treaty] provisions were deemed adequate to the ends of justice in cases of persons committing crimes in a foreign country . . . and subsequently fleeing to this country. We cannot adjudge that Congress in this matter has abused its discretion, nor decline to enforce obedience to its will as expressed . . . ."). The rule of non-inquiry "serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request." Hoxha v. Levi, 465 F.3d 554, 563 (3d Cir. 2006); see also Koskotas v. Roche, 931 F.2d 169, 174 (1st Cir. 1991) (observing that "extradition proceedings 'necessarily implicate the foreign policy interests of the United States'" (quoting Escobedo v. United States, 623 F.2d 1098, 1105 (5th Cir. 1980))).[4] As this court explained in

---

[4] The rule of non-inquiry is related to the "act of state" doctrine, which "in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964); see Kin-Hong, 110 F.3d at 111 n.11 (noting parallel); see also First Nat'l City Bank v. Banco Nacional de

<u>Kin-Hong</u>, 110 F.3d at 111, "[i]t is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed." <u>See</u> <u>also</u> <u>Ahmad</u> v. <u>Wigen</u>, 910 F.2d 1063, 1067 (2d Cir. 1990) ("It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."); <u>Escobedo</u>, 623 F.2d at 1107 ("[T]he degree of risk to [the relator's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch." (quoting <u>Sindona</u> v. <u>Grant</u>, 619 F.2d 167, 174 (2d Cir. 1980))).

                              III.

     On appeal, Hilton argues first that, in light of his severe psychological impairments and high risk of suicide, his extradition to Scotland would violate his Fifth Amendment right to due process. As presented here, this claim amounts to a challenge to the conditions awaiting him in Scotland, and is barred by the rule of non-inquiry. Next, on appeal Hilton presses an argument not fully developed below regarding whether his medical condition precludes placing him in custody -- either in the United States or

---

<u>Cuba</u>, 406 U.S. 759, 769 (1972) (plurality opinion) (explaining that the act of state doctrine was "fashioned because of fear that adjudication would interfere with the conduct of foreign relations").

in Scotland.  This claim, however, is simply too speculative at this stage.[5]  Finally, Hilton claims that his extradition would violate his constitutional rights because Scotland allows simple majority jury verdicts, and that because the Senate was never apprised of the Scottish jury system it did not give its knowing advice and consent to the United States-United Kingdom extradition treaty as required by Article II, § 2, cl. 2.  The former claim fails under the rule of non-inquiry, as this court may not pass judgment on the merits of the Scottish jury system.  The latter claim fails because it is not for this court to consider whether the Senate's advice and consent was substantively adequate.  The Secretary may choose to assess and credit Hilton's claims that his mental health status should bar extradition on humanitarian grounds, and that he will not receive an adequate jury trial.  We will not bar extradition on either basis.

A.        Standard of Review

On appeal from an order denying a petition for a writ of habeas corpus, this court reviews the district court's legal conclusions de novo, In re Extradition of Howard, 996 F.2d at 1327, and any factual findings for clear error, Gomes v. Brady, 564 F.3d 532, 536 (1st Cir. 2009).  Ordinarily, "habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether

---

[5]  Whether Hilton raised before the district court precisely the nuances he raises before us is unclear, but the claim fails under any standard of review.

-13-

the offense charged is within the treaty, and . . . whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."  Koskotas, 931 F.2d at 171 (alteration in original) (quoting Fernandez v. Phillips, 268 U.S. 311, 312 (1925)) (internal quotation marks omitted).  However, as this court has observed, "serious due process concerns may merit review beyond the narrow scope of inquiry in extradition proceedings."  In re Extradition of Manzi, 888 F.2d 204, 206 (1st Cir. 1989); see also Valenzuela v. United States, 286 F.3d 1223, 1229 (11th Cir. 2002) ("Despite our limited role in extradition proceedings, the judiciary must ensure that the constitutional rights of individuals subject to extradition are observed.").[6]

B.      Mental Illness

Hilton argues that his extradition to Scotland would result in an increased risk of suicide and would thereby involve deliberate indifference on the part of the United States officials

---

[6]  As the Seventh Circuit explained in In re Burt:
[T]he broad language of Fernandez, which on its face would appear to restrict the scope of inquiry here, must be construed "in the context of its time and in the context of subsequent development of the scope of habeas corpus review."  Only subsequent to Fernandez did the Supreme Court substantially redefine the scope of habeas corpus review, which previously had been tied to an examination of jurisdictional defects, to include an evaluation of whether the petitioner is being held in violation of any of his or her constitutional rights.
737 F.2d at 1484.

authorizing the extradition.  Hilton's argument fails under the rule of non-inquiry.

Hilton emphasizes that doubts about the ability of the United States authorities to keep him from committing suicide during the period leading up to the Secretary's decision whether to extradite substantiates his claim that he should not be extradited at all.  Such doubts, however, rest on speculation.

Hilton's core argument is that his extradition to Scotland would result in his suffering from an increased risk of suicide and, for that reason, that United States officials would infringe upon his due process rights by authorizing the extradition.  It rests upon on a "state created danger" theory of due process.  See Rivera v. Rhode Island, 402 F.3d 27, 35 (1st Cir. 2005).  The argument is squarely foreclosed by the rule of non-inquiry.  Whether the conditions Hilton would face would have deleterious effects on his mental health so as to constitute a bar to extradition (or require conditions on extradition) is a question for the Secretary of State and not for this court.

Hilton contends that the rule of non-inquiry has no application here because his allegations are directed at United States officials as opposed to officials from the requesting state.  On Hilton's theory, any challenge to the conditions awaiting an individual upon extradition could be recast as a challenge to the

conduct of United States officials on the basis of but-for causation. The rule of non-inquiry is not so easily circumvented.

Hilton points to <u>Plaster</u> and <u>Burt</u> as extradition cases in which the rule of non-inquiry did not bar consideration of a petitioner's due process claim based upon the actions of United States officials. He mischaracterizes those cases. Both <u>Plaster</u> and <u>Burt</u> involved challenges based upon actions or inaction by United States officials apart from the act of extradition itself. In <u>Plaster</u>, for example, the petitioner challenged the Government's alleged breach of an immunity agreement. 720 F.2d at 344-45. In <u>Burt</u>, the petitioner challenged extradition on the ground that the Government had waited fifteen years before deciding to extradite. 737 F.2d at 1485-86. Here, by contrast, Hilton's challenge is based only on the fact of extradition itself and seeks to block it. As the district court explained:

> No case law suggests that courts have the authority to go beyond the limited statutorily prescribed inquiry when the extradition itself is the only action challenged. Instead, the case law clearly shows that when humanitarian concerns surrounding the extradition are raised, including those involving danger to the relator's life, they are for the Secretary of State to consider.

<u>Hilton</u>, 2013 WL 5755485, at *4.[7]

---

[7] Hilton argues that the principle of reciprocity counsels in favor of judicial consideration of humanitarian concerns to the extent that the United Kingdom instructs its courts, when considering a request for extradition, to take such considerations into account. <u>See</u> <u>United Kingdom Extradition Act</u>, 2003, 41, § 91

In an effort to avoid this outcome, Hilton invokes Gallina v. Fraser, 278 F.2d 77 (2d Cir. 1960). In that case, the Second Circuit expressed some hesitation toward the rule of non-inquiry, opining that it could "imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle [of non-inquiry]." Id. at 79. This court expressed a similar possible caveat in Kin-Hong. 110 F.3d at 112 ("None of these principles, including non-inquiry, may be regarded as an absolute."). No court has yet applied such a theoretical Gallina exception. Hoxha, 465 F.3d at 564 n.14. It does not help Hilton here and we decline to apply such an exception.

These arguments may be made to the Secretary. In addition, Hilton may request that the Secretary of State, in an exercise of discretion, attach conditions to Hilton's extradition ensuring his safety in Scotland. It is not the role of this court to supplant the Secretary's authority to respond to such a request. Cf. Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1149 (2013) (holding that harm alleged is not cognizable where it is based upon

_____

(instructing courts to determine whether "the physical or mental condition of the person is such that it would be unjust or oppressive to extradite him"). The United Kingdom delegates consideration of humanitarian concerns to the judiciary while, in contrast, the United States delegates such considerations to the executive. That difference is not evidence of lack of reciprocity.

"speculat[ion] as to how [Executive Branch officials] will exercise their discretion").

We turn briefly to Hilton's newly presented argument.  As confirmed by counsel at oral argument, the relief Hilton seeks in this habeas action is an order barring his extradition to Scotland. He raises, in further pursuit of that relief, what purports to be a due process challenge based upon his pre-extradition detention in the United States.

Hilton argues specifically that the Government cannot comply with its obligation to address his high risk of suicide if he is detained and so pre-extradition detention would result in "deliberate indifference" to that risk on the part of United States officials.  Hilton relies on a finding by the magistrate judge in the order granting Hilton's release following a bail hearing that Hilton's "serious psychiatric condition is likely to deteriorate if he is held in custody."  At the bail hearing, the Government "conceded that inpatient hospitalization at a mental health facility may be appropriate in this case" and that "there  are no federal secure mental health facilities for pretrial detainees where Hilton could be housed and treated."  At that same hearing, however, the Government also said it would locate a third-party inpatient facility at which Hilton's medical needs could be met.

We disagree with Hilton that he has established that the Government is unable to provide proper care and safekeeping for

him.[8]  We have no reason to expect that the Government, having now been made acutely aware of Hilton's mental health conditions, will be insensitive to that issue going forward.  Indeed, we note that the Government did assent to Hilton's motion to be seen by his treating psychologist once he began to psychologically deteriorate after first being taken into custody.  At this juncture, Hilton's claims concerning the conditions of his pre-extradition detention are too speculative for this court to consider.  See Clapper, 133 S. Ct. at 1149.  At this stage, Hilton can and should express his medical concerns to the Secretary, not the judiciary.

C.      Scotland's Simple Majority Jury Trial

Hilton argues that extradition for trial in Scotland -- where a simple majority of jurors is sufficient to return a guilty verdict -- would violate his constitutional rights because the Senate was not aware of this aspect of Scottish criminal procedure when it consented to the United States-United Kingdom extradition treaty.  In effect, Hilton asks this court to declare that the Senate's "[c]onsent" to the treaty was not sufficiently informed for purposes of Article II, § 2, cl. 2.  Hilton's claim evinces a fundamental misunderstanding of our Constitution's separation of powers.

---

[8]     We assume without deciding that the "deliberate indifference" standard applies in the context of pre-extradition detention.

Hilton's argument is built on two premises. First, citing <u>Burch</u> v. <u>Louisiana</u>, 441 U.S. 130, 139 (1979) (holding that conviction on the basis of a five-to-one majority of a six person jury was inconsistent with the Sixth Amendment right to a jury trial), Hilton says that, as a legal matter, conviction on the basis of a simple majority of a fifteen person jury would conflict with the Sixth Amendment's jury trial requirement. Second, Hilton asserts that, as a historical matter, the Senate was not informed of Scotland's jury trial practice prior to consenting to the treaty. From this, Hilton infers that his extradition would be violative of his Sixth Amendment right to a jury trial.

As to Hilton's first premise, it is well settled that "surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials." <u>Holmes</u> v. <u>Laird</u>, 459 F.2d 1211, 1219 (D.C. Cir. 1972); <u>accord</u> <u>Neely</u>, 180 U.S. at 123. The rule of non-inquiry could not stand otherwise. <u>See</u> <u>Kin-Hong</u>, 110 F.3d at 110 ("Under the rule of non-inquiry, courts refrain from 'investigating the fairness of a requesting country's judicial system' . . . ." (quoting <u>In re Extradition of Howard</u>, 996 F.2d at 1329)).

Here too Hilton invokes the <u>Gallina</u> exception. This argument plainly fails. In <u>Kin-Hong</u>, for example, this court found

that extradition of a relator to Hong Kong was consistent with its "sense of decency," reasoning that the relator was "wanted for . . . activities whose criminality is fully recognized in the United States. His extradition [was] sought by . . . a colony of Great Britain, which . . . is one of this country's most trusted treaty partners." 110 F.3d at 112. For similar reasons, we find no occasion to apply the Gallina exception here where extradition is sought by a country within the United Kingdom.

As to Hilton's second premise, the suggestion that this court may sit in judgment of the Senate in its performance of its advice and consent duties is without basis. Hilton cites no case in support of his ambitious conception of the judicial role. This lack of support is unsurprising. For "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative -- 'the political' -- departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918); cf. Williams v. Suffolk Ins. Co., 38 U.S. 415, 420 (1839) (observing that, with respect to questions of foreign relations, "it is not material to inquire, nor is it the province of the Court to determine, whether the executive be right or wrong. It is enough to know, that in the exercise of his constitutional functions, he has decided the question").

-21-

Hilton concedes that the crime charged is covered by the treaty. He does not contest that the Senate consented to the treaty with the requisite number of votes. See U.S. Const. art. II, § 2, cl. 2 (requiring that "two thirds of the Senators present concur"). As to the adequacy of the Senate's consent, that is the end of the matter.

IV.

The district court's denial of the petition for a writ of habeas corpus is affirmed.